790 A.2d 903

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
STEVEN J. CARTY, DEFENDANT–RESPONDENT.

Argued October 9, 2001—Decided March 4, 2002.

*Linda A. Shashoua,* Assistant Prosecutor, argued the cause for appellant (*Lee A. Solomon,* Camden County Prosecutor, attorney).

*Edward J. Crisonino* argued the cause for respondent.

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*John J. Farmer, Jr.,* Attorney General, attorney).

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for amicus curiae Office of the Public Defender (*Peter A. Garcia,* Acting Public Defender, attorney).

*John P. McDonald* argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (*McDonald, Rogers & Rizzolo,* attorneys).

*Kevin McNulty* argued the cause for amicus curiae American Civil Liberties Union of New Jersey (*Gibbons, Del Deo, Dolan,*

*Griffinger & Vecchione,* attorneys; *Lawrence S. Lustberg,* of counsel).

The opinion of the Court was delivered by

COLEMAN, J.

This consensual search and seizure case presents the novel question whether a request to search a motor vehicle, following a valid stop by the police, requires reasonable and articulable suspicion that a search would reveal evidence of criminal wrongdoing. The Appellate Division held that a request for consent absent reasonable and articulable suspicion violated the New Jersey Constitution and reversed the trial court's denial of defendant's motion to suppress.

We hold that, in order for a consent to search a motor vehicle and its occupants to be valid, law enforcement personnel must have a reasonable and articulable suspicion of criminal wrongdoing prior to seeking consent to search a lawfully stopped motor vehicle. The reasonable and articulable suspicion standard is derived from the New Jersey Constitution and serves the prophylactic purpose of preventing the police from turning routine traffic stops into a fishing expedition for criminal activity unrelated to the lawful stop. Because that standard was not satisfied in this case, the evidence seized must be suppressed.

I.

Defendant was a passenger in a motor vehicle that was operated by his brother, Leroy Coley, on March 27, 1997. The vehicle was stopped by State Trooper Walter Layton for traveling 74 to 75 miles per hour when the posted speed limit on the New Jersey Turnpike at that time was 55 miles per hour. After Coley signed a form consenting to a search of the vehicle, the trooper conducted a pat–down of Coley and defendant for the trooper's safety. The frisk of defendant uncovered cocaine. He was arrested immediately and later indicted for third-degree unlawful possession of cocaine, in violation of *N.J.S.A.* 2C:35–10a(1), and second-degree

possession of cocaine with intent to distribute, in violation of *N.J.S.A.* 2C:35–5a(1) and –5b(2).

Prior to trial on the indictment, defendant filed a motion pursuant to *Rule* 3:5–7 to suppress the use of the cocaine in the impending trial. During the suppression hearing, some of the evidence presented by the State conflicted with some evidence presented by defendant. The stop of the vehicle occurred at approximately 5:00 p.m. After stopping the vehicle, Trooper Layton asked Coley to produce his driver's license and the car's registration. He had neither in his possession. Although the vehicle had been rented, there is conflicting evidence whether the rental papers were in the vehicle. The trial court found they were not. Both driver and passenger, however, told the trooper that the vehicle had been rented by their father.

A computer search disclosed that Coley had a valid driver's license and that the vehicle was not stolen. The evidence, however, is also conflicting about when the trooper first became aware of those facts. The trial court did not specifically determine when the trooper first received that information from the dispatcher. That court found that "because there was no proof of ownership of the car or proof of rental status of the vehicle, [the trooper] had the right to search the car to look for those credentials and to see if there was any evidence that the car was stolen."

Although the trial court found that the trooper was justified in searching for Coley's driver's license and the car's registration, it did not explain the trooper's reasons for requesting consent to search the vehicle, the scope of which was not limited to a search for those credentials. After Coley signed the consent, the trooper asked whether he could pat him down for the trooper's safety prior to searching the vehicle. Coley agreed, but the pat-down revealed no incriminating evidence. The trooper then went back to the vehicle and asked defendant to step out so that he could search the vehicle. Defendant also was asked whether the trooper could pat him down for safety reasons because the trooper's back would be to them while searching the vehicle. Defendant also

agreed to the pat–down. As noted previously, the frisk of defendant uncovered cocaine.

The trial court found that the search was conducted pursuant to the driver's consent and satisfied the standard of voluntary and knowing consent articulated in *State v. Johnson*, 68 *N.J.* 349, 346 *A.*2d 66 (1975). The trial court also found that the pat-down reasonably was justified as the least intrusive method of securing Trooper Layton's safety while conducting the consent search of the vehicle. The trial court, therefore, denied the suppression motion. Thereafter, a jury found defendant guilty of second-degree possession of cocaine with intent to distribute and third-degree possession of the cocaine. The court sentenced defendant to a custodial term of six years.

Defendant appealed the denial of his motion to suppress the cocaine, arguing that the pat-down was illegal. In reversing that order, the Appellate Division in a published opinion observed:

> [T]he driver had not offered false information regarding his identity. He simply did not have his credentials with him. The trooper certainly had the right to detain him until he was satisfied that he was in fact dealing with a licensed driver in a car that was not stolen. There appears to be no reason at all for the trooper not to have waited, before doing anything further, for confirmation from headquarters of those facts, particularly after they were confirmed by the passenger. Had he done so, there would have been no reason for him not merely to issue the appropriate summonses, let the driver and his passenger go on their way, and be done with the matter. Rather than doing that, however, the trooper, without articulable suspicion that anything else might have been amiss, chose to ask the driver to sign a consent to search form.
>
> [*State v. Carty*, 332 *N.J.Super.* 200, 205, 753 *A.*2d 149 (App.Div.2000).]

We granted the State's petition for certification, 165 *N.J.* 605, 762 *A.*2d 219 (2000), and now affirm.

## II.

The State, through the Camden County Prosecutor, argues that the Appellate Division erred by creating a *per se* rule that a request for consent to search that is unsupported by reasonable suspicion is unconstitutional, and asserts that the ruling is contrary to a long and unbroken line of cases upholding consent as an

exception to the warrant requirement of the federal and state constitutions. The State also argues that it was improper to abandon the totality of the circumstances standard in favor of a single factor—that the search took place during a routine traffic stop.

The Attorney General, as *amicus curiae,* agrees with the prosecutor and argues further that the requirement of reasonable and articulable suspicion as a prerequisite to seeking consent to search will weaken law enforcement efforts without enhancing protection of constitutional rights. The Attorney General maintains that the Appellate Division erred by focusing on the trooper's suspicion rather than on the traditional question of the voluntariness of the consent. Finally, the Attorney General argues that a violation of internal police guidelines is not an adequate reason to enact a new rule of law.

The Public Defender, as *amicus curiae,* makes two arguments: First, that the Court should hold that Article I, paragraph 7 of the state constitution requires police to have reasonable suspicion that a consent search will yield evidence of illegal activity prior to requesting such consent, and second, that both the federal and state constitutions prohibit the police from asking questions during a *Terry* stop that do not relate either to the reason for the stop or to another offense about which the officer has obtained reasonable suspicion during the stop.

The Association of Criminal Defense Lawyers (ACDL), as *amicus curiae,* argues that the standard adopted by the Appellate Division is mandated by Article I, paragraph 7 of the New Jersey Constitution.

The American Civil Liberties Union (ACLU), as *amicus curiae,* agrees with the ACDL that our state constitution mandates an affirmance of the Appellate Division.

### III.

We begin our analysis by focusing on the law controlling consent searches. The starting point is Article I, paragraph 7 of

the New Jersey Constitution. Although our search-and-seizure provision is similar to the Fourth Amendment of the United States Constitution, consent searches under the New Jersey Constitution are afforded a higher level of scrutiny. Nearly three decades ago, this Court in *State v. Johnson, supra,* declined to adopt the federal standard of voluntary consent articulated in *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 248–49, 93 *S.Ct.* 2041, 2059, 36 *L.Ed.*2d 854 (1973). Instead, we held that under Article I, paragraph 7 of the New Jersey Constitution any consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily. *Johnson, supra,* 68 *N.J.* at 354, 346 *A.*2d 66. The burden is on the State to show that the individual giving consent knew that he or she "had a choice in the matter." *Ibid.*

In response to *Johnson,* the New Jersey State Police developed a "Consent to Search" form. That form authorizes a trooper to conduct a "complete search" of a motor vehicle or other premises as described by the officer on the face of the form. The form also states:

> I further authorize the above member of the New Jersey State Police to remove and search any letters, documents, papers, materials, or other property which is considered pertinent to the investigation, provided that I am subsequently given a receipt for anything which is removed.
>
> I have knowingly and voluntarily given my consent to the search described above. I have been advised by [the investigating officer] and fully understand that I have the right to refuse giving my consent to search.
>
> I have been further advised that I may withdraw my consent at any time during the search.

The form is filled out by the officer to include, among other things, the officer's name and a description of the vehicle to be searched. It then is presented to the consentee for his or her signature.

■ Because *Johnson* involved the search of a residence, this is the first time that this Court has addressed what the standard should be for an officer seeking consent to search incident to a lawful stop of a motor vehicle for violation of traffic laws. A lawful stop of an automobile must be based on reasonable and articulable suspicion that an offense, including a minor traffic

offense, has been or is being committed. *Delaware v. Prouse*, 440 *U.S.* 648, 663, 99 *S.Ct.* 1391, 1401, 59 *L.Ed.*2d 660, 673 (1979); *State v. Locurto*, 157 *N.J.* 463, 470, 724 *A.*2d 234 (1999). Once a lawful stop is made, the subsequent reasonable detention of the occupants of the motor vehicle constitutes a seizure. *Whren v. United States*, 517 *U.S.* 806, 809–10, 116 *S.Ct.* 1769, 1772, 135 *L.Ed.*2d 89, 95 (1996); *State v. Dickey*, 152 *N.J.* 468, 475, 706 *A.*2d 180 (1998). Such reasonable seizures, however, are permissible.

> Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the *governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts*, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion.
>
> [*United States v. Hensley*, 469 *U.S.* 221, 226, 105 *S.Ct.* 675, 679, 83 *L.Ed.*2d 604 (1985)(emphasis added) (citing *Prouse, supra*, 440 *U.S.* at 653–55, 99 *S.Ct.* at 1395–97, 59 *L.Ed.*2d at 667–68).]

The fact that the motorist already has been detained at the point when an officer asks for consent to search is not dispositive of whether a suspicionless search should be allowed to continue. Because the motorist cannot leave the area before the search is completed, unless it is terminated earlier, the detention associated with roadside searches is unlike a "mere field interrogation" where an officer may question an individual "without grounds for suspicion." *State v. Maryland*, 167 *N.J.* 471, 483, 771 *A.*2d 1220 (2001) (quoting *State v. Sheffield*, 62 *N.J.* 441, 447, 303 *A.*2d 68, *cert. denied*, 414 *U.S.* 876, 94 *S.Ct.* 83, 38 *L.Ed.*2d 121 (1973)). Roadside consent searches are instead more akin to an investigatory stop that does involve a detention. Such a stop traditionally has required reasonable and articulable suspicion. *Id.* at 487, 771 *A.*2d 1220.

## A.

First, we must grapple with the problems caused by standardless requests for consent searches of motor vehicles lawfully stopped for minor traffic offenses in the wake of *Johnson*. Commentators have observed that it is virtually impossible to drive and not unwittingly commit some infraction of our motor vehicle

code. *See* David A. Harris, *Car Wars: The Fourth Amendment's Death on the Highway,* 66 *Geo. Wash. L.Rev.* 556, 567–68 (1998) (describing how officers need simply follow motor vehicle for short periods of time in order to detect an infraction). As a result, a substantial number of drivers who travel the roads of this state are at risk of being pulled over and asked by law enforcement officials for consent to search their vehicles. "Treating all citizens like criminals in order to catch the malefactors among us represents an unwise policy choice, an outlook favoring crime prevention over all of our other values." *Johnson, supra,* 68 *N.J.* at 558, 346 *A.2d* 66.

Moreover, once a motorist is pulled over, the officer's decision to ask for consent to search is a purely discretionary one. "As Professor LaFave has noted, 'a police procedure is less threatening to Fourth Amendment values when the discretionary authority of the police (and thus the risk of arbitrary action) is kept at an absolute minimum.'" Ian D. Midgley, Comment, *Just One Question Before We Get To Ohio v. Robinette: "Are You Carrying Any Contraband ... Weapons, Drugs, Constitutional Protections ... Anything Like That?",* 48 *Case W. Res. L.Rev.* 173 (1997) (quoting 4 Wayne R. LaFave, *Search and Seizure* § 10.8(d) at 696 (3d ed.1996)). Even after the request is made the officer may continue to exercise his or her discretion. For instance, if a motorist refuses to allow the officer to search the vehicle, the officer may choose to issue a ticket instead of releasing the driver with just a warning. Another motorist stopped for the same traffic violation, however, may sacrifice his or her right to privacy and consent to a search in order to escape with only a warning. Midgley, *supra,* at 202.

A standardless request to search a lawfully stopped automobile has been problematic for a long time. To insist neither on an appropriate factual basis for suspicion directed at a particular automobile, nor on some other substantial and objective standard or rule to govern the exercise of discretion, "would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry v. Ohio,* 392

*U.S.* 1, 22, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889 (1968). Consistent with concerns over standardless requests for consent searches, not surprisingly, "[s]ituations involving a request for consent to search following an initial lawful detention have posed difficult analytical questions for courts and have been the subject of extensive commentary." *Commonwealth v. Strickler,* 563 *Pa.* 47, 757 *A.*2d 884, 890–91 (2000) (citations omitted) (finding no coercion under totality of circumstances that would invalidate continued detention by requesting consent to search).

The Pennsylvania Supreme Court in *Strickler* followed the reasoning of the United States Supreme Court in *Ohio v. Robinette,* 519 *U.S.* 33, 39–40, 117 *S.Ct.* 417, 421, 136 *L.Ed.*2d 347 (1996). In *Robinette,* the Court rejected the notion that consent is *per se* invalid unless the officer follows the "first-tell-then-ask rule" that requires the officer to inform the detained motorist that he is "legally free to go" before requesting consent to search. *Ibid.* Instead, the Court reiterated the totality of the circumstances standard for all issues of consent. *Ibid.*

Several courts since have distinguished the Supreme Court's reasoning in *Robinette,* and have held that continuing a *Terry* stop beyond that which is necessary to resolve the initial stop violates the Fourth Amendment unless there is an additional articulable and reasonable basis to continue the detention. In fact, on remand from the Supreme Court, the Ohio Supreme Court decided that the consent to search in *Robinette* still was involuntary and the fruit of an illegal detention under the state constitution because there was no basis to continue the detention after the officer issued a warning for the initial speeding violation. *State v. Robinette,* 80 *Ohio St.*3d 234, 685 *N.E.*2d 762, 767, 770–72 (1997). Similarly, in *United States v. Jones,* 234 *F.*3d 234, 241 (5th Cir.2000), the court held that although the initial stop of the defendants' vehicle for speeding was valid, the continued detention, after completing the computer check on drivers' licenses and rental papers revealed clean records, was unreasonable and violated the Fourth Amendment. Consequently, the drugs found dur-

ing the search were suppressed because the subsequent consent to search did not dissipate the Fourth Amendment violation. *Id.* at 244; *accord United States v. Valadez,* 267 *F.*3d 395, 398–99 (5th Cir.2001) (finding continued detention of defendant illegal once officer confirmed that defendant had not committed traffic violation and no reasonable suspicion of any other wrongdoing existed); *United States v. Dortch,* 199 *F.*3d 193, 198 (5th Cir.1999) (finding continued detention invalid "after the officer had informed [defendant] that the computer check was completed" but nonetheless detained defendant's car until dog team arrived); *see also United States v. Miller,* 146 *F.*3d 274, 280 (5th Cir.1998) (stating purpose of invalid traffic stop "was to seek consent of driver to search for drugs" and thus consent was tainted); *United States v. Beck,* 140 *F.*3d 1129, 1135–36 (8th Cir.1998) (finding seizure had occurred after completion of valid traffic stop when officer told defendant that he was free to go, but that he would be detained until canine unit arrived unless he consented to search of car); *United States v. Caicedo,* 85 *F.*3d 1184, 1190 (6th Cir.1996) (stating consent was fruit of illegal stop where there was only "a very brief lapse of time" between suspicionless pat-down search and request to search defendant's backpack "during which nothing of significance occurred"); *People v. Brownlee,* 186 *Ill.*2d 501, 239 *Ill.Dec.* 25, 713 *N.E.*2d 556, 565–66 (1999) (noting officers' actions after traffic stop was concluded constituted show of authority such that reasonable person would conclude he or she was not free to leave); *Ferris v. State,* 355 *Md.* 356, 735 *A.*2d 491, 503 & n. 6 (1999) (finding illegal continued detention after officer returned license and registration with citation for speeding but then asked driver "if he would mind" stepping to the back of the vehicle to answer questions).

The standard of reasonable and articulable suspicion has been applied to consent searches by at least one other state. In *State v. Quino,* 74 *Haw.* 161, 840 *P.*2d 358, 364–65 (1992), *cert. denied,* 507 *U.S.* 1031, 113 *S.Ct.* 1849, 123 *L.Ed.*2d 472 (1993), the Hawaii Supreme Court invalidated airport encounters in which law enforcement officers approached airline passengers and requested consent to search their luggage or person without articulable

suspicion of wrongdoing. *Id.* at 363-64. The court found: "We cannot allow the police to randomly 'encounter' individuals without any objective basis for suspecting them of misconduct and then place them in a coercive environment in order to develop a reasonable suspicion to justify their detention." *Id.* at 365. The court therefore invalidated the search as an unconstitutional seizure. *Id.* at 364-65.

Unlike many other courts around the country, this Court has not previously grappled with the problems caused by standardless requests for consent to search a lawfully stopped motor vehicle. But one of our observations in *Johnson* is reflective of the problem. There, we observed that "[m]any persons, perhaps most, would view the request of a police officer to make a search as having the force of law." *Johnson, supra,* 68 *N.J.* at 354, 346 *A.*2d 66. In the context of motor vehicle stops, where the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels compelled to consent. *Cf.* Wesley MacNeil Oliver, *With an Evil Eye and an Unequal Hand: Pretextual Stops and Doctrinal Remedies to Racial Profiling,* 74 *Tul. L.Rev.* 1409, 1465 (2000) (stating that "[p]sychological studies further confirm that ... there is an almost reflexive impulse to obey an authority figure."); *see also* Adrian J. Barrio, Note, *Rethinking Schneckloth v. Bustamonte: Incorporating Obedience Theory into the Supreme Court's Conception of Voluntary Consent,* 1997 *U. Ill. L.Rev.* 215, 233-40 (discussing psychological studies regarding authority figures).

Indeed, data from the New Jersey State Police Independent Monitors' most recent reports indicate that thirty-four out of thirty-six people agreed to consent searches at the request of officers over an approximately nine month period. *Monitor's Second Report: Long-term Compliance Audit,* at 8 (Jan. 10, 2001), *Monitors' Third Report: Long Term Compliance Audit,* at 8 (Apr.2001), and *Monitors' Fourth Report: Long–Term Compliance Audit,* at 8 (July 17, 2001), *available at* http://

www.state.nj.us/lps/ decreehome.htm. That figure indicates that nearly ninety-five percent of detained motorists granted a law enforcement officer's request for consent to search. What is more compelling is that those motorists granted consent after officers used tactics such as the following:

> Extended detention and questioning regarding issues not related to the reason for the stop, such as "How much money do you have in your pocket?" and "Why are you riding around on the New Jersey Turnpike?" ...;
>
> The use of intimidating statements to obtain consent to search (such as "... the drug dog's on the way," and "... once the drug dog gets here, everybody gets arrested," ....); and
>
> The use of "hypothetical" consent requests, a violation of both policy and the decree, such as "if I asked for consent to search your car, would you sign it?"
> [*Monitors' Fourth Report: Long-term Compliance Audit, supra*, at 11–12.]

Yet, despite the frequency with which consent to search is given, the vast majority of motorists subjected to consent searches following traffic stops are not charged with any violation. The Attorney General's *Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling*, at 28 (April 20, 1999), *available at* http://www.state.nj.us/lps/ decreehome.htm, indicates that four out of every five persons who submit to consent searches are innocent of any wrongdoing. With only a twenty-percent rate of crime detection among randomly targeted motorists, the effectiveness of roadside consents as a law enforcement technique is undermined and clearly does not outweigh the citizen's state constitutional interest in remaining secure from intrusion.

The cumulative effect has been that we no longer have confidence that a consent to search under *Johnson* truly can be voluntary or otherwise reasonable without modifying the *Johnson* standard. " 'Consent' that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick*, 501 *U.S.* 429, 438, 111 *S.Ct.* 2382, 2388, 115 *L.Ed.*2d 389 (1991). What can be synthesized from a review of scholarly articles, cases from around the country, and the empirical data referred to in this

opinion, is that despite use of the first-tell-then-ask rule or the voluntary and knowing standard adopted in *Johnson,* consent searches following valid motor vehicle stops are either not voluntary because people feel compelled to consent for various reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search. Stated differently, hindsight has taught us that the *Johnson* standard has not been effective in protecting our citizens' interest against unreasonable intrusions when it comes to suspicionless consent searches following valid motor vehicle stops. We therefore must consider an appropriate modification of the *Johnson* standard.

### B.

Given the widespread abuse of our existing law that allows law enforcement officers to obtain consent searches of every motor vehicle stopped for even the most minor traffic violation, we must decide what objective standard should be imposed to restore some semblance of reasonableness to the type of consent searches involved in the present case. The Appellate Division held that "in the absence of an articulable suspicion, the request to search to which the driver assented offended the State Constitution." *Carty, supra,* 332 *N.J.Super.* at 202, 753 *A.*2d 149. The court reasoned:

> Requests to consent to an automobile search are obviously, as a matter of common experience, likely to be complied with. Consequently, baseless requests almost inevitably result in a search. It is our view that travelers on our State highways should not be subject to the harassment, embarrassment[,] and inconvenience of an automobile search following a routine traffic stop unless the officer has at least an articulable suspicion that the search will yield evidence of illegal activity.

> [*Id.* at 207, 753 *A.*2d 149.]

The court then found that, because the trooper almost immediately could have ascertained that the driver had a valid license and that the car had not been stolen, the trooper had no reasonable and articulable suspicion that the motor vehicle contained any evidence of any illegal wrongdoing. *Id.* at 206, 753 *A.*2d 149.

The State urges this Court to find that a standard of reasonable and articulable suspicion is unnecessary with regard to consent searches. The State contends that it already carries the "heavy burden" of proving that consent is knowing and voluntary and that, once that burden is met, this Court should invalidate a consent search only if the request to consent was made on the basis of race or ethnicity. *State v. Maryland, supra,* 167 *N.J.* at 484, 771 *A.*2d 1220 (prohibiting race-based field inquiries).

We agree with the Appellate Division that consent searches following a lawful stop of a motor vehicle should not be deemed valid under *Johnson* unless there is reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity. In other words, we are expanding the *Johnson* two-part constitutional standard and holding that unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional. A suspicionless consent search shall be deemed unconstitutional whether it preceded or followed completion of the lawful traffic stop. The requirement of reasonable and articulable suspicion is derived from our State Constitution and serves to validate the continued detention associated with the search. It also serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop. Indeed, our holding is consistent with both the State Police Standard Operating Procedures and the Consent Decree that was entered into by the State Police on December 29, 1999. *Carty, supra,* 332 *N.J.Super.* at 206, 753 *A.*2d 149.

When the foregoing constitutional requirement is applied to this case, we agree with the Appellate Division that Trooper Layton lacked reasonable and articulable suspicion that a search would reveal any evidence of criminal wrongdoing. *Id.* at 202, 205, 753 *A.*2d 149. At the suppression hearing, the trooper testified that he requested to search the vehicle merely because

the driver and defendant "appeared to be nervous" and because he believed that defendant's and the driver's stories conflicted. However, as the trial court noted, their stories did not conflict—defendant merely gave a more detailed explanation of where they had been than the explanation given by the driver.

■ Moreover, under the New Jersey Constitution, the appearance of nervousness is not sufficient grounds for the reasonable and articulable suspicion necessary to extend the scope of a detention beyond the reason for the original stop. "Nervousness and furtive gestures may, in conjunction with other objective facts, justify a *Terry* search, but ordinarily '[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity.'" *State v. Lund*, 119 *N.J.* 35, 47, 573 *A.*2d 1376 (1990) (alteration in original) (quoting *State v. Schlosser*, 774 *P.*2d 1132, 1137 (Utah 1989)). Because defendant's and the driver's stories did not conflict, there was nothing more than nervousness to raise the trooper's suspicions. Although the trooper claimed that he did not have information regarding the status of the driver's license and the registration of the car, at most that lack of information was due to his failure to be informed immediately because the information was easily at his disposal. We conclude, therefore, that the record does not support a finding that the trooper had a reasonable and articulable suspicion to request the driver's consent to search the vehicle. Because the *Terry* frisk of defendant was incident to Coley's consent to search the vehicle, all the evidence seized shall be suppressed.

The concurring member's sole disagreement is that the Court should not constitutionalize the requirement that, for a consent search to be valid, the police must have a reasonable and articulable suspicion that a criminal offense is being or has been committed prior to requesting consent to search. The objections of the concurrence are twofold. First, it suggests that the Court is invoking the New Jersey Constitution lightly. *Post* at 656, 790 *A.*2d at 918. Second, the concurrence worries that, as a necessary

corollary to constitutionalizing the standard, the "fruit of the constitutional violation doctrine" will limit "the state's use in criminal prosecutions of voluntary confessions, as well as other evidence of criminal conduct, that may directly result from a consent search conducted without the requisite level of reasonable and articulable suspicion." *Post* at 657–58, 790 *A.*2d at 918.

The Court has not acted lightly in grounding the reasonable and articulable suspicion standard in our State Constitution. The Court used our State Constitution in *Johnson* when it determined the current requirements for a valid consent search. To now say that the requirements that the consent be knowing and voluntary are of constitutional dimensions, but a reasonable and articulable suspicion prior to requesting the consent is not, would represent a major retrenchment by this Court.

With regard to the latter objection, the concurrence relies on the prophylactic procedural rule articulated in *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). That rule was adopted to protect the Fifth Amendment requirement that no person can be compelled in any criminal case to be a witness against himself or herself. *Miranda* held that in order for a defendant to waive the privilege of self-incrimination, the government has the burden of demonstrating that any waiver was made "voluntarily, knowingly, and intelligently." *Miranda, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707. To ensure that any waiver of the Fifth Amendment privilege is voluntarily, knowingly, and intelligently given, the Court established prophylactic-procedural requirements that *Miranda* warnings be administered before conducting custodial interrogations, and failure to give those warnings creates an irrebuttable presumption of compulsion as to use of unwarned statements in the State's case-in-chief. *Id.* at 479, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726. Consequently, the *Miranda* rule was established to address concerns raised under the Fifth Amendment and the concurrence cites only Fifth Amendment federal cases that have applied that rule. In-

deed, this Court has rejected use of *Miranda* as merely a prophylactic rule even in the context of the Fifth Amendment and our common-law privilege against self-incrimination. *State v. Hartley*, 103 *N.J.* 252, 271–78, 511 *A.*2d 80 (1986).

Consent searches raise issues concerning one of the well-established exceptions to the Fourth Amendment warrant requirement. Although the exclusionary rule applies to both Fourth Amendment, *State v. Novembrino*, 105 *N.J.* 95, 132–44, 519 *A.*2d 820 (1987), and Fifth Amendment violations because its purpose is "to deter police misconduct and to preserve the integrity of the courts," *State v. Johnson*, 118 *N.J.* 639, 651, 573 *A.*2d 909 (1990), "unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." *Dickerson v. United States*, 530 *U.S.* 428, 441, 120 *S.Ct.* 2326, 2335, 147 *L.Ed.*2d 405, 418 (2000). Because they are "sufficiently different to warrant a separate" treatment, Yale Kamisar, *Miranda Thirty Five Years Later: A Close Look at the Majority and Dissenting Opinions in Dickerson*, 33 *Ariz. St. L.J.* 387, 411 n. 147 (2001), the Burger and Rehnquist Courts have refused to extend *Miranda*'s prophylactic rule to Fourth Amendment jurisprudence. Carol S. Steiker, *Counter–Revolution In Constitutional Criminal Procedure? Two Audiences, Two Answers*, 94 *Mich. L.Rev.* 2466, 2493 (1996).

The reasonable and articulable suspicion standard is a well-established constitutional requirement under the Fourth Amendment and the comparable provision of the New Jersey Constitution to determine the reasonableness of police conduct. For example, *Prouse* uses it to determine when a motor vehicle may be stopped; *Terry* uses it to determine when a pat-down or frisk may be conducted and when an investigatory stop is proper. Because the constitutional, reasonable and articulable suspicion standard is required to stop a motor vehicle and to conduct a pat-down of its occupants, it would be incongruous to hold that the standard suddenly becomes prophylactic and lacks constitutional force when it is used to determine the reasonableness of the police in asking

the driver or owner of the stopped motor vehicle to consent to a search of that vehicle. Rather than confusing the police with the concurrence's approach, we have made the standard "readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged" by retaining the constitutionalization of the standard throughout the encounter. *New York v. Belton*, 453 *U.S.* 454, 458, 101 *S.Ct.* 2860, 2863, 69 *L.Ed.*2d 768, 773 (1981).

Finally, the concurrence correctly states that constitutionalization of the reasonable and articulable suspicion standard will permit invocation of the fruit of the poisonous tree doctrine. The State, however, will be permitted to demonstrate whether the taint of some illegal consent searches has been attenuated. *Brown v. Illinois*, 422 *U.S.* 590, 602–03, 95 *S.Ct.* 2254, 2261, 45 *L.Ed.*2d 416 (1975); *State v. Barry*, 86 *N.J.* 80, 87, 429 *A.*2d 581, *cert. denied*, 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L.Ed.*2d 415 (1981).

## IV.

Finally, we must decide whether the new rule of law we announce today should have any retroactive application. We believe that because we are affirming the judgment of the Appellate Division, our decision should be applied retroactively to all stops made after June 23, 2000, the date on which the Appellate Division rendered its decision. We emphasize that our decision is intended to establish the minimum threshold requirement for determining when consent searches of a validly stopped motor vehicle and its occupants are constitutionally permitted under *Johnson*. Consequently, our decision rests exclusively on "bona fide separate, adequate, and independent [state] grounds." *Michigan v. Long*, 463 *U.S.* 1032, 1041, 103 *S.Ct.* 3469, 3476, 77 *L.Ed.*2d 1201, 1214 (1983). "To the extent that we rely on federal precedents in reaching our state-law decision, we do so only for the purpose of guidance, recognizing that those precedents may not compel the result that we reach today." *State v. Hartley, supra*, 103 *N.J.* at 286, 511 *A.*2d 80.

## V.

To avoid confusion in attempts to overextend our holding in this case in light of the September 11, 2001 attack on the World Trade Center and the Pentagon, we wish to make clear the limitations of this opinion. This decision does not affect the principles enunciated in various state and federal cases that allow roadblocks, checkpoints and the like based on a concern for the public safety. As does the United States Supreme Court, "we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *United States v. Martinez–Fuerte*, 428 *U.S.* 543, 558, 96 *S.Ct.* 3074, 3083, 49 *L.Ed.*2d 1116 (1976). Additionally,

> [f]or Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion."
>
> [*Delaware v. Prouse*, 440 *U.S.* 648, 657, 99 *S.Ct.* 1391, 1398, 59 *L.Ed.*2d 660 (1979) (quoting *United States v. Ortiz*, 422 *U.S.* 891, 894–95, 95 *S.Ct.* 2585, 2587, 45 *L.Ed.*2d 623 (1975)).]

Moreover, the special governmental concerns regarding public safety or national security merit full public cooperation with a constitutionally permissible roadblock or checkpoint.

 Under the search and seizure provision of the New Jersey Constitution, Article I, paragraph 7, roadblocks established on a purely discretionary basis are invalid. *State v. Kirk*, 202 *N.J.Super.* 28, 38–44, 493 *A.*2d 1271 (App.Div.1985). In order to pass muster under our state constitution, a roadblock or checkpoint must be established for a specific need and to achieve a particular purpose at a specific place. *Id.* at 37, 493 *A.*2d 1271.

> If the road block was established by a command or supervisory authority and was carefully targeted to a designated area at a specified time and place based on data justifying the site selection for reasons of public safety and reasonably efficacious or productive law enforcement goals, the road block will likely pass constitutional muster. Other factors which enhanced judicial approval were (1) adequate warn-

ings to avoid frightening the traveling public, (2) advance general publicity designed to deter drunken drivers from getting in cars in the first place, and (3) officially specified neutral and courteous procedures for the intercepting officers to follow when stopping drivers.

[*Id.* at 40–41, 493 *A.*2d 1271.]

*Accord State v. Flowers,* 328 *N.J.Super.* 205, 207, 218, 745 *A.*2d 553 (App.Div.2000) (upholding roadblock designed to detect stolen cars in area with high rate of auto theft by stopping every vehicle); *State v. Kadelak,* 280 *N.J.Super.* 349, 377, 655 *A.*2d 461 (App.Div.), *certif. denied,* 141 *N.J.* 98, 660 *A.*2d 1197 (1995) (upholding roadblock designed to detect vehicle safety violations by stopping every fifth vehicle and vehicles with obvious safety violations); *State v. Barcia,* 235 *N.J.Super.* 311, 316, 318–19, 562 *A.*2d 246 (App.Div.1989) (invalidating roadblock designed to intercept interstate drug trafficking as arbitrary and excessive where roadblock caused over one million vehicles to come to complete stop and wait in line for up to four hours). It follows that roadblock or checkpoint stops cannot be designed simply to check for criminal violations, *Kirk, supra,* 202 *N.J.Super.* at 55, 493 *A.*2d 1271, and that any car detained for further investigation must be detained on the basis of a reasonable and particularized suspicion that the motorist or vehicle is associated with criminal wrongdoing. *State v. Reynolds,* 319 *N.J.Super.* 426, 434, 725 *A.*2d 1129 (App.Div. 1998) (finding officer at roadblock had both "articulable suspicion of intoxication" and probable cause that justified sending defendant to secondary area for further sobriety analysis). In general, roadblocks may be justified "based on reasons of public safety and reasonably efficacious or productive law enforcement goals." *State v. Mazurek,* 237 *N.J.Super.* 231, 235, 567 *A.*2d 277 (App.Div. 1989), *certif. denied,* 121 *N.J.* 623, 583 *A.*2d 320 (1990) (internal quotations omitted). The balance to be struck is whether "the checkpoint advance[s] the public interest to a much greater degree than could be achieved through traditional less intrusive police procedures." *Id.* at 239, 567 *A.*2d 277.

Likewise, federal courts, in analyzing checkpoints, have adopted a balancing test that involves the gravity of the safety interest, the effectiveness of the checkpoint, and the intrusion on the individu-

al's privacy. *Michigan Dep't of State Police v. Sitz,* 496 *U.S.* 444, 448–49, 110 *S.Ct.* 2481, 2484, 110 *L.Ed.*2d 412 (1990). Although the United States Supreme Court has approved sobriety checkpoints because of "the magnitude of the drunken driving problem [and] the States' interest in eradicating it," *id.* at 451, 110 *S.Ct.* at 2485, the Court also has stated:

> We address only the initial stop of each motorist passing through a checkpoint and the associated preliminary questioning and observation by checkpoint officers. Detention of particular motorists for more extensive field sobriety testing may require satisfaction of an individualized suspicion standard.

> [*Id.* at 450–51, 110 *S.Ct.* at 2485.]

*Accord Martinez–Fuerte, supra,* 428 *U.S.* at 567, 96 *S.Ct.* at 3087 (approving highway checkpoints for detecting illegal aliens but stating that " '[A]ny further detention . . . must be based on consent or probable cause.' *United States v. Brignoni–Ponce,* [422 *U.S.* 873, 882, 95 *S.Ct.* 2574, 2580, 45 *L.Ed.*2d 607 (1975) ]."). Where there is no individualized suspicion, as in the case of airport security, federal courts apply the balancing test. *See, e.g., United States v. Herzbrun,* 723 *F.*2d 773, 775 (11th Cir.1984) (upholding airport searches "[d]ue to the intense danger of air piracy"); *United States v. Edwards,* 498 *F.*2d 496, 500 (2d Cir.1974) (upholding airport searches of carry-on baggage with magnetometers to prevent airplane hijacking and/or bombing where device searched all carry-on baggage).

The need to protect public safety today is perhaps even more readily apparent than it was when those cases were decided. Therefore, the holding in the present case is limited in that it pertains to consent searches pursuant to a stop for a traffic infraction. In times of national crisis the jurisprudence of the United States Supreme Court and the federal circuit courts have carved out exceptions to the normal search and seizure protections afforded to Americans. We do not disturb that jurisprudence with our decision today, which rests exclusively on independent state grounds.

## VI.

The judgment of the Appellate Division reversing the Law Division's denial of the motion to suppress is affirmed. The matter is remanded to the Law Division to vacate the judgment of conviction.

STEIN, J., concurring.

The Court today holds that a consent to search a motor vehicle and its occupants is invalid unless the police officer, following a valid stop of the vehicle, possesses a reasonable and articulable suspicion that a search would reveal evidence of a crime. The Court's holding applies only to consent searches of vehicles stopped for traffic-type violations, and is based on evidence in the record that the use by police officers of consent searches in those circumstances has been abused. The Court's holding is consistent with the current State Police Standard Operating Procedures and the December 29, 1999 Consent Decree entered into by the State Police with the United States Department of Justice. The Court's decision is one of great significance to all those who operate motor vehicles on our State's roadways. With but one reservation, I enthusiastically join the Court's disposition.

I

My reservation about the Court's decision is based on its holding that our State Constitution is the source of the requirement that a police officer who requests a motorist to consent to a search of his vehicle after a lawful traffic stop must have in advance a reasonable and articulable suspicion that the search will reveal evidence of criminal activity. *Ante* at 647, 790 *A*.2d at 912. I would impose precisely the same condition as does the Court, but would not rely on the State Constitution as its source. Rather, based on the virtually uncontradicted evidence that some police officers in New Jersey frequently have abused the power to request consents to search motor vehicles after routine traffic stops—and that motorists routinely accede to those requests—I

would hold that the requirement of reasonable and articulable suspicion that a search will reveal evidence of a crime is simply a prophylactic rule of law adopted by this court for the purpose of preventing abuses of the power of law enforcement officers to request motorists to consent to searches of their motor vehicles.

Two reasons counsel against constitutionalizing the Court's holding. The first is that the Court's analysis encourages fragmentation of the protections afforded by the State Constitution. As noted, the Court's holding establishes a constitutional standard that applies only to requests for consents to search motor vehicles after a traffic stop, *ante* at 635, 790 *A*.2d at 905, but does not apply to the wide variety of other settings in which consent searches may be sought by police officers. Thus the Court's newly established constitutional principle has no application to consent searches in airports, bus terminals, train stations, college dormitories, private homes, or business premises.

Our State constitution has been described as the State's "organic law" and as a document that "embodies the will of the people, as the final law[.]" *Gangemi v. Berry*, 25 *N.J.* 1, 12–13, 134 *A*.2d 1 (1957). Its fundamental role is to function as the core of the legal principles that guide the operation of State government. In *Vreeland v. Byrne*, 72 *N.J.* 292, 310, 370 *A*.2d 825 (1977), the Court explained:

> The cornerstone of our state government is our state Constitution. All state governmental action whether it be executive, legislative or judicial must conform to this organic law. Even though governmental action is generally clothed with a presumption of legality, the judiciary, which is the final arbiter of what the Constitution means, must strike down governmental action which offends a constitutional provision.

Because the Constitution serves as the State's organic law, we ordinarily do not invoke its protections lightly, to apply only to some but not all aspects of the challenged activity. See *State v. Novembrino*, 105 *N.J.* 95, 158, 519 *A*.2d 820 (1987) (rejecting good-faith exception to exclusionary rule adopted by United States Supreme Court and holding inadmissible under New Jersey Con-

stitution evidence seized pursuant to warrant issued without probable cause where well-trained officer relied in good faith on warrant in gathering evidence); *State v. Hunt,* 91 *N.J.* 338, 346–48, 450 *A.*2d 952 (1982) (holding invalid under New Jersey Constitution warrantless search and seizure of toll billing records); *State v. Alston,* 88 *N.J.* 211, 226, 440 *A.*2d 1311 (1981) (holding under New Jersey Constitution that defendants, driver, and passengers in automobile owned by another had automatic standing to challenge admissibility of weapons found by police in warrantless search of vehicle, and holding that automatic standing rule under State Constitution applies to any persons charged with offense in which possession of seized evidence at time of contested search is essential element of guilt); *State v. Johnson,* 68 *N.J.* 349, 353–54, 346 *A.*2d 66 (1975) (holding that under Art. 1, par. 7 of New Jersey Constitution the validity of *all* consents to search "must be measured in terms of waiver[,]" requiring the State to bear "burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse").

Secondly, from a law enforcement perspective, the Court's unnecessary constitutionalization of its holding significantly limits the State's use in criminal prosecutions of voluntary confessions, as well as other evidence of criminal conduct, that may directly result from a consent search conducted without the requisite level of reasonable and articulable suspicion. The Attorney General, undoubtedly reflecting similar concerns, strongly opposes constitutional or judicial limits on automobile consent searches and, citing to the *Monitor's Fifth Report* by the Civil Rights Division of the Department of Justice, asserts that enhanced training of police officers already has been effective in limiting abuses in the conduct of automobile consent searches. A significant difference exists, however, between the more substantial law enforcement implications of a constitutional holding compared to the less restrictive effect of a judicially imposed limitation on automobile consent searches.

This Court explained the distinction in *State v. Hartley,* 103 *N.J.* 252, 511 *A.*2d 80 (1986). There, after twice rejecting FBI requests to make a statement and asserting his right to remain silent, defendant was asked again—without new *Miranda* warnings—to make an inculpatory statement, and he did so. Immediately thereafter he gave a confession, after new *Miranda* warnings, to the Atlantic City police. This Court held that "the FBI's failure scrupulously to honor Hartley's previously-invoked right to silence was a violation of constitutional magnitude, and the federal statement is deemed to have been unconstitutionally and illegally (under state law) compelled." *Id.* at 283, 511 *A.*2d 80. Because the confession to the Atlantic City police came "on the heels of—if not in tandem with—the first, unconstitutionally—obtained, compelled statement," *id.* at 284, 511 *A.*2d 80, the Court applied the " 'fruit of the constitutional violation doctrine,' " *id.* at 283, 511 *A.*2d 80, and held that the confession to Atlantic City police was inadmissible because it was tainted by the constitutional violation. *Id.* at 283–84, 511 *A.*2d 80. The Court contrasted its holding with that of *Oregon v. Elstad,* 470 *U.S.* 298, 105 *S.Ct.* 1285, 84 *L.Ed.*2d 222 (1985), where the accused, who initially provided police with a voluntary but unwarned inculpatory statement, subsequently provided a full confession, following *Miranda* warnings, that was held admissible. 470 *U.S.* at 307–08, 105 *S.Ct.* at 1292–93, 84 *L.Ed.*2d at 231–32. In its *Hartley* opinion, the Court distinguished *Elstad:*

> As now becomes obvious, the difference between *Elstad* and the case before us takes on critical importance. In *Elstad* the failure to have furnished the accused with his *Miranda* warnings resulted in exclusion of only his unwarned statement. Because that statement was indisputably voluntary, a subsequent confession was untainted. There having been no *constitutional* violation in connection with the obtaining of the first statement, the second statement could not be perceived as the *fruit* of a constitutional violation, and it was therefore admissible.
>
> [103 *N.J.* at 282–83, 511 *A.*2d 80.]

The principle articulated in *Hartley* could preclude the admissibility not only of confessions, but also of other evidence of crime the existence of which was learned in the course of a consent search of a vehicle conducted without the required level of reasonable and articulable suspicion. *See Wong Sun v. United States,*

371 *U.S.* 471, 485–86, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 454 (1963) (holding that where police officers' unlawful entry into petitioner Toy's living quarters resulted in declaration by Toy leading police to discover narcotics at residence of Yee, "fruit of poisonous tree" doctrine required exclusion of heroin found at Yee's residence in government's prosecution of Toy). Referring to the "fruit of the poisonous tree doctrine," the Supreme Court in *Elstad, supra,* observed: "This figure of speech is drawn from *Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963), in which the Court held that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. The *Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment violation is a confession." 470 *U.S.* at 305–06, 105 *S.Ct.* at 1291, 84 *L.Ed.*2d at 230.

Similarly in *Michigan v. Tucker,* 417 *U.S.* 433, 435, 94 *S.Ct.* 2357, 2359, 41 *L.Ed.*2d 182, 187 (1974), the issue was

whether the testimony of a witness in respondent's state court trial for rape must be excluded simply because police had learned the identity of the witness by questioning respondent at a time when he was in custody as a suspect, but had not been advised that counsel would be appointed for him if he was indigent.

The defendant had been questioned before the Court's decision in *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), but his trial occurred afterwards. The Court observed that the failure of police to warn defendant of his right to counsel implicated the *Miranda* procedural safeguards that "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected." *Id.* at 444, 94 *S.Ct.* at 2363, 41 *L.Ed.*2d at 193. The Court cited *Wong Sun, supra,* for the principle that "the 'fruits' of police conduct [that] actually infringed a defendant's Fourth Amendment rights must be suppressed," and observed that "we have already concluded that the police conduct at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the proply-lactic standards later laid down by this Court in Miranda to safeguard that privilege." *Id.* at 445–56, 94 *S.Ct.* at 2364–65, 41

*L.Ed.*2d at 194. Because the evidence sought to be introduced was the testimony of a third party whose identity was not learned in the course of a constitutional violation, the Court held that the witness' testimony was improperly excluded. *Id.* at 452, 94 *S.Ct.* at 2367–68, 41 *L.Ed.*2d at 197.

Accordingly, *Wong Sun, Elstad, Tucker,* and this Court's decision in *Hartley* make clear that evidence, confessions or the identity of witnesses uncovered as a result of a violation by police officers of the federal or state constitutions ordinarily will be inadmissible unless the taint is alleviated by the passage of time or intervening circumstances. In the case of evidence, confessions, or information about witnesses to crime indirectly resulting from a consent search of a motor vehicle that does not meet the Court's new constitutional standard, exclusion of such collateral by-products of the search constitutes in my view too severe a restriction on the work and interests of law enforcement. In other appropriate circumstances the Court deliberately has elected to rest its holding on common-law rather than on constitutional principles. In *State v. Reed,* 133 *N.J.* 237, 262, 627 *A.*2d 630 (1993), the Court held that failure by police to inform a suspect in custody that an attorney retained by a friend was at police headquarters and had asked to confer with him rendered the suspect's subsequent waiver of the privilege against self-incrimination invalid *per se.* The Court stated:

> We now hold, however, that the failure of the police to inform defendant that an attorney was present and asking to speak with him violated defendant's State privilege against self-incrimination. *We decline, therefore, to resolve the issue of whether the police conduct was so egregious as to offend the due-process guaranteed by our State Constitution.*
>
> [*Id.* at 268, 627 *A.*2d 630(emphasis added).]

Moreover, embedding the Court's requirement of reasonable and articulable suspicion in the Constitution "effectively prevents the other branches of government from exercising their own responsibility to protect a citizen's right to be free from unreasonable searches and seizures." *Novembrino, supra,* 105 *N.J.* at 171, 519 *A.*2d 820 (Handler, J., concurring). The Attorney General observes that State Police practices in conducting consent

searches already have improved significantly. Constitutionalizing the Court's holding diminishes the judiciary's flexibility in this area if subsequent developments were to alter or modify the need for strict adherence to the standard adopted by the Court.

Because in my view a judicially imposed rule of law requiring reasonable and articulable suspicion of criminality as a predicate for consent searches of motor vehicles, rather than one mandated by the State Constitution, fully protects the interest of the motoring public without unduly burdening law enforcement interests, I would not rely on the State Constitution as the source of the Court's holding.