NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0136-16T1

STATE OF NEW JERSEY,

 Plaintiff-Appellant,

v.

RANDOLPH MCLEOD,

 Defendant-Respondent.

 Argued March 16, 2017 – Decided June 8, 2017

 Before Judges Alvarez and Accurso.

 On appeal from the Superior Court of New
 Jersey, Law Division, Middlesex County,
 Indictment Nos. 13-07-0984 and 13-07-0991.

 David M. Liston, Assistant Prosecutor, argued
 the cause for appellant (Andrew C. Carey,
 Middlesex County Prosecutor, attorney; Mr.
 Liston, of counsel and on the brief).

 Stefan Van Jura, Deputy Public Defender II,
 argued the cause for respondent (Joseph E.
 Krakora, Public Defender, attorney; Mr. Van
 Jura, of counsel and on the brief).

PER CURIAM

 By leave granted, the State appeals a March 23, 2016 order

suppressing evidence after a hearing on defendant Randolph
McLeod's motion, as well as the judge's subsequent denial of

reconsideration. We now reverse.

 Defendant was indicted for fourth-degree being an unlicensed

bounty hunter, N.J.S.A. 45:19-30 (count one); three counts of

second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)

(counts two, four, and six); four counts of second-degree

possession of a weapon for unlawful purposes, N.J.S.A. 2C:39-4(a)

(counts three, five, seven, and nine); fourth-degree unlawful

possession of hollow point bullets, N.J.S.A. 2C:39-3(f) (count

ten); fourth-degree unlawful possession of a stun gun, N.J.S.A.

2C:39-3(h) (count eleven); four counts of fourth-degree unlawful

possession of a large capacity ammunition magazine, N.J.S.A.

2C:39-3(j) (counts twelve, thirteen, fourteen, fifteen); two

counts of fourth-degree possession of a prohibited weapon, an

expandable baton, N.J.S.A. 2C:39-3(e) (counts sixteen and

seventeen); two counts of fourth-degree possession of imitation

firearms, N.J.S.A. 2C:39-4(e) (counts eighteen and nineteen);

fourth-degree violation of regulatory provision, N.J.S.A. 2C:58-3

and/or 2C:58-4, N.J.S.A. 2C:39-10 (count twenty); and fourth-

degree hindering, N.J.S.A. 2C:29-3(b)(4) (county twenty-one).

 Woodbridge Police Department Patrol Officer Thomas Ganci,

Jr., testified that on March 27, 2013, he passed a blue Crown

Victoria with tinted side windows, lights in the grill, and

 2 A-0136-16T1
spotlights on the sides. His attention was drawn to the vehicle

because it was headed west "a little fast" while he was headed

east in a marked vehicle. Ganci promptly made a u-turn and

followed. The Crown Victoria, which to that point had been

traveling in the center lane, suddenly made a sharp left across

the far left lane of travel towards the exit ramp. After the

vehicle halted at a stop sign, the driver rolled down his car

window, and gave Ganci a "thumbs-up" signal, proceeding to make

another sharp left into a parking lot.

 Ganci followed the car into the lot, learned that the owner

had a suspended license, and turned on his overhead lights, which

activated the patrol car's video camera. The driver got out of

the Crown Victoria and immediately walked over to him. Ganci

testified that the driver said, "something to the effect of, 'we

just came from your department. We just came from you guys. I

have a warrant here for this person.'" The driver seemed nervous

and talked very fast. He wore battle dress uniform (BDU) pants,

a bullet-proof vest which had the words, "Sergeant Johnson"

embroidered on the left side, and a nylon duty holster around his

belt and one on his thigh, with an empty gun holster.

 The paper the driver handed Ganci only had a person's name

written on it, and no other information. Ganci had difficulty

understanding the driver, but thought he said something about a

 3 A-0136-16T1
warrant and that the driver intended to apprehend the person. When

asked about the registered owner of the vehicle, the driver said

it was his partner, whose father was a lieutenant in the Newark

Police Department.

 The driver handed Ganci an unfamiliar form of identification,

indicating the driver was a bounty hunter. When Ganci asked him

to identify the department with which he was affiliated, he said

"[n]o, we're bounty hunters." He was unable to produce a driver's

license, although he looked in the back seat of his car, opened

the trunk, briefly looked in a duffle bag, and said something to

the effect of "[y]ou know, I might have left it on the counter[.]"

 The driver gave his name as Edward Johnson IV, and when asked

if he used a middle initial, he first said no and then said the

letter "B."1 Johnson provided Ganci with a correct date of birth.

By that juncture, defendant, who was the passenger, had stepped

out of the vehicle and handed Ganci his cell phone, stating the

registered owner was on the line. Ganci spoke to someone who said

the occupants had permission to drive his car.

 When Ganci tried to pin Johnson down as to his precise title,

he initially declared he and defendant "[w]e're bail bondsmen[.]"

Defendant interrupted him and said "[w]e're fugitive recovery."

1
 Johnson is named in the indictment for virtually the same
offenses; he is defendant's co-defendant.

 4 A-0136-16T1
As a result, Ganci became concerned since the men "gave me three

separate titles as to who they were and . . . they didn't even

know what -- who they worked for, what their job was."

 Defendant was dressed in the same manner as Johnson, including

an empty gun holster. Johnson had a criminal warrant out of the

Town of Orange and a traffic warrant from the Newark Municipal

Court. Defendant also had an active arrest warrant either out of

Long Branch or West Long Branch municipal court.

 After backup arrived, Sergeant Richard Velez and Ganci spoke

about the possibility of searching the vehicle. Velez decided to

call a detective to the scene, Detective Richard Yanak, to obtain

a consent to search the car.

 Once Yanak arrived, he and Ganci can be heard discussing the

possibility of a search on the video tape from the stop played

during the hearing. When Yanak asked Ganci if defendant had any

weapons, Ganci responded that he had not seen any. Yanak then

said:

 I know [bail bondsmen] carry bullet proof
 vests and stuff like that; they're allowed to.
 Unless they have a (indiscernible), holsters
 and stuff like that, they can have. But if
 there's a gun in it, they better have the
 information on them 'cause of them, 99 percent
 of them, don't -- aren't allowed to carry.

Johnson consented to the search after being read the form. Towards

the end of the search, a man claiming to be the owner of the

 5 A-0136-16T1
vehicle appeared with a licensed driver. By then, the officers

had located firearms, hollow point bullets, and a stun gun, among

other items.

 The trial judge found that the consent to search was obtained

voluntarily, a point not in dispute. His concern was whether

there was sufficient reasonable and articulable suspicion as

required under State v. Carty, 170 N.J. 632, 647, modified on

other grounds, 174 N.J. 351 (2002), to request consent in the

first place. In his opinion, looking at the totality of the

circumstances, there was insufficient reasonable and articulable

suspicion "to suggest that the driver or passenger had engaged in,

or were about to engage in, criminal activity." He found that the

initial testimony established that the officers intended to arrest

Johnson and defendant on the outstanding warrants, and secure the

vehicle for retrieval by the owner.

 In the judge's opinion, when Yanak arrived at the scene,

however, that plan changed because he had a "hunch" that bail bond

employees often illegally carry firearms. The judge further opined

that the empty holsters were not indicative of criminal activity,

nor were the men's clothing. That the driver was nervous did not

alter the equation. The judge considered Yanak's "presentiment"

not equivalent to reasonable and articulable suspicion. He

therefore suppressed the evidence.

 6 A-0136-16T1
 On appeal, the State contends that the trial judge erred

because he mischaracterized the facts, namely, that the decision

to search was based on Yanak's expression of a hunch. The State

also argues that the judge misunderstood the type of scenario the

Carty reasonable and articulable suspicion standard was intended

to address, and that in any event the circumstances presented

ample reasonable and articulable suspicion.

 We review a motion judge's factual findings in a suppression

hearing with great deference. State v. Gonzales, 227 N.J. 77, 101

(2016). They are upheld "so long as those findings are supported

by sufficient credible evidence in the record." State v. Rockford,

213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1,

15 (2009)). The deference with which we review those factual

findings is "substantially influenced by [the motion judge's]

opportunity to hear and see the witnesses and to have the 'feel'

of the case, which a reviewing court cannot enjoy." State v.

Johnson, 42 N.J. 146, 161 (1964). We owe no deference, however,

to the trial court's legal conclusions or interpretation of the

legal consequences that flow from established facts. As always,

our review in that regard is de novo. State v. Watts, 223 N.J.

503, 516 (2015); State v. Vargas, 213 N.J. 301, 327 (2013).

 Under the Fourth Amendment of the United States Constitution

and Article I, Paragraph 7, of the New Jersey Constitution, a

 7 A-0136-16T1
warrantless search is presumed invalid. The burden is on the

State to prove it "falls within one of the few well delineated

exceptions to the warrant requirement." State v. Pineiro, 181

N.J. 13, 19 (2004) (quoting State v. Maryland, 167 N.J. 471, 482

(2001)). Consent is a well-recognized exception to the Fourth

Amendment's search warrant requirement. Schneckloth v.

Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed.

2d 854, 858 (1973). The voluntary or knowing nature of the consent

is not challenged here. See State v. Sugar, 100 N.J. 214, 234

(1985).

 Once the validity of a consent to search has been established,

the burden then shifts to the defendant to establish some

illegality in the manner of execution. State v. Robinson, 200

N.J. 1, 7-8 (2009) (citing State v. Valencia, 93 N.J. 126, 133

(1983)).

 Although the Law Division judge made no specific finding, it

is clear that he considered Ganci a credible witness. Ganci's

testimony was corroborated by a second officer who testified

regarding unrelated issues, as well as by the video of the entire

incident, which the judge watched. His conclusion, not supported

by Ganci's testimony, appeared to be that until Yanak arrived, and

articulated his "hunch," the officers were not considering

searching the Crown Victoria. That is not the testimony.

 8 A-0136-16T1
 Ganci said that he and Velez discussed obtaining a consent

to search because of their concerns, and Velez called Yanak to the

scene for that very reason. Furthermore, Yanak did not say that

there was a possibility weapons would be found in the car based

on a guess. He said, captured on the video:

 I know they carry bullet proof vests and stuff
 like that; they're allowed to. Unless they
 have a (indiscernible), holsters and stuff
 like that, they can have. But if there's a
 gun in it, they better have the information
 on them 'cause of them, 99 percent of them,
 don't --- aren't allowed to carry.

The basis for his certainty that most "bounty hunters" do not have

permits to carry weapons is unknown——but his expression was of a

certainty, based on some knowledge, not a guess. Moreover, the

comment followed a discussion with Ganci regarding Ganci's

suspicions based on his encounter with the driver and defendant.

 The stop of this automobile was lawful. The car was

proceeding at a rate of speed that caught Ganci's attention,

attempted to evade the patrol car by turning unexpectedly onto a

side street when the officer was observed to have made a u-turn,

attempted to engage Ganci in a friendly exchange by a thumbs-up

gesture, and immediately pulled into a parking lot. Once Ganci

pulled in behind the vehicle and stopped, Johnson promptly got out

of his car and approached him. The tinted windows, themselves a

violation of New Jersey's motor vehicle code, N.J.S.A. 39:3-74,

 9 A-0136-16T1
warranted the stop without consideration of the other

circumstances.

 During the stop, the conduct of the driver and the passenger

was suspicious. The officer could not elicit a definite answer

from the two men as to the nature of their employment, the name

of the person that they were seeking to apprehend, and by whom

they were employed. They were dressed in highly unusual military

or police garb, which would, when added to the driver's

nervousness, establish the reasonable and articulable suspicion

that the empty holsters meant that weapons would likely be found

in the car.

 Before a consent to search can be requested, reasonable and

articulable suspicion must be demonstrated. See Carty, supra, 170

N.J. at 635. This doctrine was developed specifically to address

"unreasonable intrusions when it comes to suspicionless consent

searches following valid motor vehicle stops." Id. at 646. It

was intended to deter "the widespread abuse of our existing law

that allows law enforcement officers to obtain consent searches

of every motor vehicle stopped for even the most minor traffic

violation." Ibid. An "objective standard [was] imposed to restore

some semblance of reasonableness" to requests for consent to search

during routine motorist/police encounters. Ibid. The State

demonstrated in this case, however, that the officers had an

 10 A-0136-16T1
objective reasonable and articulable suspicion to obtain consent

to search, a far cry from the fishing expeditions barred by Carty.

 Preliminarily, reasonable suspicion may be based on an

officer's prior experiences. See State v. Stovall, 170 N.J. 346,

361 (2002). Yanak's seeming knowledge regarding the habits of

bail bondsmen was not speculation, but based on some prior

experience or training. It is inconsequential that he did not

identify the source of his knowledge given the fact he was standing

with other officers and two suspects in a public parking lot in

the midst of a stop. That he expressed himself as having

"knowledge" is consequential. It was not a "hunch."

 In any event, where the driver and his passenger could not

give a good report of their destination, had outstanding warrants,

were not driving their own vehicle, appeared nervous, and initially

attempted to misrepresent themselves as law enforcement,

reasonable and articulable suspicion that justified the request

for a consent to search was well demonstrated. See Carty, supra,

170 N.J. at 635; State v. Thomas, 392 N.J. Super. 169, 188 (App.

Div.), certif. denied, 192 N.J. 597 (2007). The standard is far

lower than probable cause and is determined objectively. See

State v. Elders, 192 N.J. 224, 250 (2007); Stovall, supra, 170

N.J. at 356.

 11 A-0136-16T1
 The interests of justice demand intervention and correction

because, first, the trial court misheard testimony. Additionally,

even were we not to conclude the court mistakenly interpreted the

record, we disagree with the court's legal determination. The

circumstances did give rise to a reasonable and articulable

suspicion that a search would produce evidence of criminal

wrongdoing.

 Reversed and remanded to the Law Division for further

proceedings consistent with this opinion.

 12 A-0136-16T1