**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0509-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CARLOS I. ALCANTARA,

    Defendant-Appellant.

_____

Submitted March 16, 2022 – Decided July 1, 2022

Before Judges Hoffman and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-10-1566.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his guilty plea conviction for first-degree racketeering and from the twelve-year prison sentence that was imposed in accordance with the negotiated plea agreement. Defendant challenges the January 29, 2019 order issued by Judge Joseph L. Rea denying defendant's motion to suppress evidence that had been seized from his vehicle pursuant to a consent-to-search given after he was arrested for an active warrant. Although defendant does not challenge the lawfulness of the motor vehicle stop and his ensuing arrest based on the outstanding warrant, he alleges that the officer's entry into the vehicle to look for an insurance identification card was a pretext and that the officer did not have reasonable and articulable suspicion to justify the consent search that was later conducted at the police station. Defendant further contends that Judge Rea abused his discretion by refusing to reopen the suppression hearing and expand the record to include an electronic enhancement of the audio portion of the mobile video recording (MVR) of the roadside encounter. After carefully reviewing the record in light of the arguments of the parties and the applicable principles of law, we reject defendant's contentions and affirm the denial of the suppression motion. We also reject defendant's argument that the sentence imposed was excessive.

2

I.

We discern the following facts from the plea hearing. Defendant admitted that he became involved in a theft and racketeering enterprise, rose through the ranks of the enterprise, and recruited others to join the conspiracy. Defendant and his coconspirators formed shell corporations and established bank accounts into which they deposited stolen money. The money would then be transferred abroad. The factual basis for the guilty plea shows that more than $500,000 passed through the racketeering enterprise.

In October 2016, a Middlesex County grand jury indicted defendant and forty-four codefendants with: first-degree racketeering, N.J.S.A. 2C:41-2(c) and 2C:41-2(d) (count one); second-degree conspiracy to commit theft, financial facilitation of criminal activity, receiving stolen property and promoting organized street crime, N.J.S.A. 2C:5-2, 2C:20-4(a) and 2C:21-25(a) (count two); second-degree leader of organized crime, N.J.S.A. 2C:5-2(g) (count three); first-degree financial facilitation of criminal activity (money laundering), N.J.S.A. 2C:21-25(a), 2C:21-25(b) or 2C:21-25(c) (count four); first-degree promoting organized street crime, N.J.S.A. 2C:33-30 (count five); second-degree theft by deception, N.J.S.A. 2C:20-4(a) and 2C:2-6 (count six); second-degree receiving stolen property, N.J.S.A. 20:20-7 and 2C:2-6 (count seven);

3

A-0509-20

second-degree misconduct by a corporate official, N.J.S.A. 2C:41-2(c), 2C:5-2, 2C:21-25, 2C:33-30, 2C:20-7, 2C:21-4(a), 2C:21-9(c), and 2C:2-6 (count eight); fourth-degree falsifying records, N.J.S.A. 2C:21-4(a) (count nine); third-degree failure to file business tax returns, N.J.S.A. 54:52-8 (count ten); third-degree failure to file personal tax returns, N.J.S.A. 54:52-8 (count eleven); third-degree failure to pay income taxes, N.J.S.A. 54:52-9 (count twelve); and third-degree filing a fraudulent tax return, N.J.S.A. 54:52-10 (count thirteen).

Defendant moved to suppress physical evidence seized from his vehicle. Judge Rea presided over the suppression hearing, which occurred over the course of three days in July, September, and November 2018. The State presented testimony from three witnesses: an FBI agent from Florida, Investigator Ryan Tighe from the Middlesex County Prosecutor's Office (MCPO), and Perth Amboy Police Officer Dennis Marte, who executed the initial motor vehicle stop.

On January 29, 2019, Judge Rea denied the motion to suppress, rendering a comprehensive oral opinion that spanned more than thirty pages of transcript. On June 26, 2019, Judge Rea denied defendant's motion to supplement and expand the motion-to-suppress record with an enhanced audio recording of the dashcam recording of the motor vehicle stop.

A-0509-20

On the same day, defendant pled guilty to count one, first-degree racketeering, pursuant to a negotiated agreement. The State agreed to dismiss the remaining counts and to recommend a sentence of twelve years in prison, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant agreed to cooperate with the FBI and the United States Attorney's Office for the Southern District of Florida.

Defendant provided a factual basis for the guilty plea and Judge Rea accepted it. On October 8, 2020, Judge Rea sentenced defendant in accordance with the plea agreement to twelve years in prison, subject to NERA. In accordance with Rule 3:5-7(d), defendant preserved the right to appeal the denial of the motion to suppress.

This appeal follows. Defendant raises the following contentions for our consideration:

POINT I

THE TRIAL COURT ERRED WHEN IT FAILED TO CONSIDER THE ENHANCED AUDIO RECORDING WHICH CLEARLY CALLED INTO QUESTION THE VERACITY OF THE ARRESTING OFFICER'S TESTIMONY THAT DEFENDANT DID NOT HAVE AN INSURANCE CARD, THUS CALLING INTO QUESTION WHETHER THE ENTRY INTO DEFENDANT'S VEHICLE WAS LAWFUL.

## POINT II

AS THE ARRESTING OFFICER LACKED AN ARTICULABLE REASONABLE SUSPICION THAT DEFENDANT HAD ENGAGED IN, OR WAS ABOUT TO ENGAGE IN, CRIMINAL ACTIVITY, THERE WAS NO BASIS TO ASK DEFENDANT FOR CONSENT TO SEARCH HIS VEHICLE.

## POINT III

AS THE ARRESTING OFFICER'S ENTRY INTO DEFENDANT'S VEHICLE TO ALLEGEDLY LOOK FOR AN INSURANCE CARD WAS A PRETEXT, THE ENTRY AND SUBSEQUENT SEARCH WAS UNLAWFUL AND ANY SEIZURE THEREOF MUST BE SUPPRESSED AS "FRUIT OF THE POISONOUS TREE."

## POINT IV

THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR AND RELIABLE HEARING.

## POINT V

DEFENDANT'S SENTENCE WAS MANIFESTLY EXCESSIVE AND UNFAIR UNDER THE CIRCUMSTANCES.

## II.

We first address defendant's contention that Judge Rea erred in denying the motion to suppress. Specifically, defendant contends Officer Marte's entry into the detained vehicle to look for the insurance identification card before it

6

was towed was a pretext to search the car for criminal evidence.  He also contends that the officer did not have reasonable and articulable suspicion of criminal activity to justify asking defendant for permission to conduct a consent search.

## A.

The following pertinent facts were elicited at the suppression hearing.  On February 24, 2016, Officer Marte was on patrol in a marked police vehicle that was equipped with a mobile data terminal.  As he drove westbound on Smith Street in Perth Amboy, Marte ran a random license plate check on a Honda Crosstour that had passed him.[1]  That check revealed that there was an outstanding warrant for the registered owner.

Officer Marte turned around, activated the lights and siren on his patrol vehicle, and initiated a stop of the Honda on Smith Street near a Conrail station. Defendant pulled over and stopped in a no parking zone.

Marte approached the driver's side door.  Defendant, who was the sole occupant of the vehicle, lowered the window and the officer asked him to

---

[1]  Defendant does not challenge the officer's authority to run a random license plate check or to stop defendant's vehicle once the officer determined that there was an outstanding arrest warrant for the registered owner.  See State v. Segars, 172 N.J. 481 (2002); State v. Donis, 157 N.J. 44 (1988).

produce his driving credentials. Defendant produced a valid driver's license and registration but was not able to produce a valid insurance identification card.[2] While standing outside the car, Marte observed numerous credit cards scattered on the front passenger seat, along with a large sum of money and other documents. Having established defendant's identity and that he was the registered owner of the vehicle, Marte confirmed with the police dispatcher that there was an outstanding warrant for defendant's arrest.[3]

Officer Marte instructed defendant to get out of the Honda. As defendant exited, Marte again saw through the open door cash, credit cards, and documents scattered on the passenger side. Marte testified that as he stood by the driver's side door, he could see in the center console area the paperwork and cards "all over the seats," including paperwork on the floor. The credit cards were "all over the place." As he stood outside the vehicle, Marte could not see the names on the various cards.

---

[2] Marte eventually issued a ticket to defendant for not having an insurance card as required by N.J.S.A. 39:3-29.

[3] The warrant had been issued because of defendant's failure to pay a $550 fine for a motor vehicle violation for unsafe driving. Defendant does not dispute the validity of the arrest warrant or the lawfulness of the arrest based upon that warrant.

A-0509-20

Marte advised defendant that he was being arrested on the outstanding warrant and proceeded to handcuff him. Marte then conducted a search of defendant's person that revealed a wad of cash in the amount of $10,000 in the breast pocket of defendant's jacket. The cash was wrapped in a band from the bank that had a date on it from the month of October. Defendant explained that the money was a tax refund.[4] Marte testified that he was skeptical of that explanation because the bank band around the money was from October—four months before the present encounter. Marte testified that the amount of cash on defendant's person and the items scattered in the Honda made him suspicious because he knew about credit card fraud and the scamming of ATM cards. He had been instructed to be on the lookout for this type of fraud.

Marte secured defendant in the police car and called for back-up assistance. Marte determined to have the car impounded because defendant's vehicle had pulled over and come to a stop in a tow away zone, and there was no other vehicle occupant to drive the car away.[5]

---

[4] Defendant on appeal does not contend that Marte violated defendant's rights under Miranda v. Arizona, 384 U.S. 436 (1966).

[5] The officer acknowledged that there was metered parking on another part of Smith Street, but noted that no one would be available to keep putting money into a meter.

A-0509-20

It took about twenty to twenty-five minutes for the tow truck to arrive. Marte testified that he needed defendant's registration and insurance information to complete the towing report.

The MVR recording shows that Marte leaned into the vehicle twice. The officer testified that the first time he was looking for defendant's insurance card. The second time, he was looking for the keys in the ignition and the insurance card. As he leaned into the vehicle, Marte saw the same credit cards and paperwork that he had observed while he was standing outside the vehicle. Marte testified that the interior of the vehicle was "a mess" and that he leaned into the vehicle for about sixty seconds. He did not move anything that he saw and did not seize anything from the Honda at the scene of the stop.

Defendant's vehicle was towed to police headquarters. Marte followed the tow truck with defendant in the back seat of the police car. The MVR in the patrol car continued to record. During the drive to police headquarters, defendant asked what he needed to do to get his car back. Marte told him that he needed to produce a valid insurance card.

Once at police headquarters, Officer Marte and his supervising sergeant advised defendant of his Miranda rights. The Miranda waiver form was read to defendant in English. Defendant waived his Miranda rights.

A-0509-20

The officers next presented defendant with a consent to search form and asked for his consent to search his vehicle. Defendant granted consent and indicated that he wanted to be present during the search of his vehicle.

The motor vehicle stop, the ride to police headquarters, the administration of <u>Miranda</u> warnings, and the consent-to-search waiver colloquy were all electronically recorded. The recordings were played in open court during the suppression hearing.

The police searched defendant's car pursuant to the consent and seized: numerous credit cards with different names of persons and businesses, documents pertaining to wire transfers to China for large amounts of money, $4900 in cash, and three cell phones. No insurance card was found in the vehicle.

Defendant argued at the hearing that the evidence seized from his vehicle should be suppressed because there was no probable cause to believe his vehicle contained contraband and thus the automobile exception to the warrant requirement did not apply. Defendant also argued that police did not have a particularized and reasonable suspicion of criminal activity to justify asking defendant for consent to search the vehicle. Defendant also argued that Marte had entered the car under the pretext of looking for a missing insurance

identification card and that the ensuing search at the police station was a fruit of that pretext.

The State argued that defendant had been pulled over and arrested based on an active warrant and, thus, it was not necessary for police to have reasonable suspicion to ask for consent, but that in any event, there was reasonable and articulable suspicion to believe that the car contained evidence of criminal activity to justify the consent search.

The State also argued that material in the car was lawfully seized under the plain view doctrine because Marte was lawfully present outside the car when he first saw them and also was lawfully present inside the vehicle while conducting a credentials search.

The State further argued in the alternative that even if the search was unlawful, the evidence is admissible under the inevitable discovery and independent source exceptions to the exclusionary rule in view of an ongoing federal investigation.[6]

---

[6] We note that much of the State's evidence presented at the three-day suppression hearing pertained to an ongoing federal money laundering investigation. Because we agree with the trial court that the consent search was lawful, we need not discuss the motion hearing testimony about the federal investigation, which is pertinent only to the State's argument that the material seized from defendant's car would inevitably have been discovered as part of the federal investigation.

A-0509-20

B.

Judge Rea issued his decision from the bench on January 29, 2019. The judge noted at the outset that he had watched the MVR video, and he commented on the poor quality of the audio. He first ruled on the State's inevitable discovery and independent source arguments. He rejected those arguments, and instead found that at the time of the motor vehicle stop, the FBI was already investigating defendant for suspected criminal activities in Florida. Judge Rea also found, however, that there was no link in the federal investigation to activities in New Jersey until after the FBI saw the county's press release and then contacted the MCPO.

Judge Rea also rejected the State's argument that the materials could lawfully have been seized from the car under the plain view exception to the warrant requirement. Judge Rea noted that while Officer Marte had testified credibly that he observed the credit cards, paperwork, and the cash while standing outside defendant's vehicle, he had not noticed the names on any of the cards. Even when he was inside the vehicle looking for an insurance card, Marte did not look at the names on the cards. Thus, Judge Rea reasoned, Marte's observations established only the presence of the credit cards and cash but not probable cause to believe that they were the proceeds or instrumentalities of

A-0509-20

criminal activity. Accordingly, the plain view exception does not apply. See Minnesota v. Dickerson, 508 U.S. 366, 379 (1993) (holding that probable cause to believe an object is contraband or evidence of a crime must be immediately apparent to justify a plain view or touch seizure).

Judge Rea next found that Marte's testimony was "very credible." The judge held that Officer Marte had properly initiated a stop of defendant's motor vehicle. Based upon his viewing of the MVR video, the judge found that the officer approached the driver's side window and that he and defendant exchanged paperwork. Judge Rea explained that he could discern from the MVR recording that during the trip to the police station Marte told defendant that he could not take back possession of his vehicle without proof of insurance. That supported the officer's testimony that defendant had not produced a valid insurance identification card. Judge Rea further noted that Marte issued a ticket for failure to produce that document. The judge ruled that Officer Marte was thus entitled to conduct a limited search for the insurance card. Judge Rea also found credible Marte's testimony that while he was inside the vehicle, his search was limited to looking for an insurance card and that he did not conduct an impermissible search of the items he saw in the passenger cabin.

A-0509-20

Judge Rea also found that there was a lawful basis to tow the vehicle to the police station. The judge reasoned that because defendant had not produced a valid insurance card, the vehicle could not be driven. The judge further noted that the vehicle had stopped in a no parking zone on a busy street. The police thus had no option but to have the vehicle towed.

Importantly for purposes of this appeal, Judge Rea also found that once at the station, the officers had lawful authority to ask for permission to conduct a consent search. Judge Rea held that the police had reasonable suspicion to believe the vehicle contained evidence of criminal activity, satisfying the requirement set forth in State v. Carty, 170 N.J. 632 (2002). The judge concluded that the police "would have been derelict in their duties" if they had not asked for consent to investigate whether the credit cards strewn about in the vehicle were legitimate.

Judge Rea further ruled that the MVR recording showed that the police properly went through the consent-to-search form with defendant. Defendant was no longer in handcuffs and the judge saw on the video that defendant checked off on the form that he was granting consent and also checked off on the form that he wanted to be present during execution of the search. The judge added that the police followed "the textbook way" of obtaining consent. Judge

Rea thus concluded that the State had met its burden of proving by "clear and positive" evidence that defendant had knowingly and voluntarily consented to the search.

C.

We begin our analysis by acknowledging the legal principles governing this appeal. We review a trial court's ruling on a motion to suppress evidence "with substantial deference to the trial court's factual findings, which we 'must uphold . . . so long as those findings are supported by sufficient credible evidence in the record.'" State v. Hinton, 216 N.J. 211, 228 (2013) (quoting State v. Handy, 206 N.J. 39, 44 (2011)). This deference applies to "factual findings based on a video recording or documentary evidence" to ensure that trial courts remain "the finder of the facts." State v. S.S., 229 N.J. 360, 381 (2017). We review a trial court's legal conclusions de novo. Id. at 380.

To effectuate a lawful investigatory stop, an officer must show "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry v. Ohio, 392 U.S 1, 21 (1968)). "The 'articulable reasons' or 'particularized suspicion' of criminal activity must be based upon the law enforcement officer's assessment of the

16

totality of the circumstances . . . ." State v. Davis, 104 N.J. 490, 504 (1986). "There must be 'some objective manifestation that the person [detained] is, or is about to be engaged in criminal activity.'" State v. Pineiro, 181 N.J. 13, 22 (2004) (alteration in original) (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)). However, "[t]he suspicion need not rise to the 'probable cause necessary to justify an arrest.'" Id. at 20 (quoting State v. Nishina, 175 N.J. 502, 511 (2003)).

When, during a lawful stop, a driver is unwilling or unable to present proof of his driving credentials as required by N.J.S.A. 39:3-29, the police may conduct a limited search of those places in the vehicle where those credentials are ordinarily kept. See State v. Terry, 232 N.J. 218, 222 (2018). The search is a limited one, and must be confined to the glove compartment or other areas, such as the center console area, where the driving credentials reasonably might be found. Id. at 223; State v. Hamlett, 449 N.J. Super. 159, 174 (App. Div. 2017). Furthermore, the driver must be given an opportunity to present his registration or his insurance information before the police may conduct a search for those credentials. State v. Keaton, 222 N.J. 438, 442–43 (2015).

A consent search is another one of the well-defined exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973);

17

State v. Johnson, 68 N.J. 349, 353–54 (1975); State v. King, 44 N.J. 346, 352 (1965).  It is, of course, fundamental that consent to search must be voluntary.  Bustamonte, 412 U.S. at 222.  Moreover, under the New Jersey Constitution, a consent to search is valid only if the person giving consent has knowledge of his or her right to refuse.  Johnson, 68 N.J. at 353–54.  In deciding whether consent to search was voluntarily and knowingly given, a reviewing court must consider the totality of the circumstances.  King, 44 N.J. at 352–53.  "Voluntariness is a question of fact to be determined from all the circumstances."  Bustamonte, 412 U.S. at 248–49.  To meet its burden of proof, the State is required to prove voluntariness by "clear and positive testimony."  King, 44 N.J. at 352; State v. Douglas, 204 N.J. Super. 265, 277 (App. Div. 1985).  Under the New Jersey Constitution, when the police request a consent to search during the course of a motor vehicle stop, the police must have a reasonable and articulable suspicion that the search will produce evidence of criminal wrongdoing.  Carty, 170 N.J. at 635.

We next apply these general principles to the facts of this case as found by the trial court.  We agree that the search of defendant's car was lawfully conducted pursuant to the consent search doctrine for the reasons explained in

Judge Rea's thorough and thoughtful oral opinion. We add the following comments.

We agree that the stop was lawfully initiated based on information learned during a lawful random license plate check that the registered owner of the vehicle was subject to an active arrest warrant. Defendant was lawfully arrested pursuant to the warrant once Officer Marte determined that defendant was the registered owner and confirmed with the dispatcher that the warrant was valid and active. We also agree that Officer Marte was permitted to lean into the vehicle to look for the insurance identification after defendant had been given an opportunity to produce it.

We reject defendant's contention that the credentials search was a pretext to search the car for evidence of criminality. For one thing, the lawfulness of police conduct is measured by an objective standard. The subjective thoughts of an officer are not relevant. See State v. Bruzzese, 94 N.J. 210, 223 (1983) (holding the Fourth Amendment proscribes unreasonable actions, not improper thoughts); see also State v. Gonzales, 227 N.J. 77, 82 (2016) (eliminating the inadvertence requirement from the plain view exception, noting it is inconsistent with the strong preference for objective standards of reasonableness and

19

inadvertence analysis calls for subjective inquiry into an individual officer's motivations).

Furthermore, we accept Judge Rea's finding that Marte testified truthfully as to the reason why he entered the vehicle and that he did not move or examine the credit cards and thus did not learn anything about them that he did not already know from his observations made from outside the vehicle.

We reject defendant's claims that the search of his vehicle at the police station violated State v. Witt, 223 N.J. 409 (2015). That case establishes the elements of the automobile exception to the warrant requirement under the New Jersey Constitution. The State does not rely, however, on that exception. Rather, the State contends—and Judge Rea found—that the warrantless search of defendant's car at the police station falls under the consent search exception to the warrant requirement.

We add with respect to the consent search doctrine that defendant's reliance on Carty is misplaced. In that case, our Supreme Court relied on Article I, paragraph 7 of the New Jersey Constitution to establish a requirement that police must have reasonable and articulable suspicion to believe that a search would reveal evidence of a crime before they may ask for permission to conduct a consent search of a detained motor vehicle. Carty, 170 N.J. at 638–40. As the

Court explained in State v. Domicz, "[o]ur Carty decision addressed concerns about the then intractable problem of racial profiling on our highways and 'the widespread abuse of our existing law that allow[ed] law enforcement officers to obtain consent searches of every motor vehicle stopped for even the most minor traffic violation.'"  188 N.J. 285, 304 (2006) (second alteration in original) (citation omitted) (quoting Carty, 170 N.J. at 646).  The Court in Domicz ruled that police do not require reasonable suspicion to ask for permission to search a house.  Id. at 305.

In this case, the request to conduct a consent search did not prolong the duration of the roadside encounter, which had already escalated to an arrest and was relocated to the scene of the police station based on the active arrest warrant of the sole vehicle occupant.  But even assuming for the sake of argument that police could not ask for consent to search the lawfully impounded vehicle without reasonable suspicion, as Judge Rea aptly found, there was reasonable suspicion to believe that the vehicle contained evidence of criminal activity. That suspicion was based on Officer Marte's observations of the numerous credit cards and cash scattered within the passenger cabin coupled with the cash found on defendant's person during the lawful search incident to his arrest.  We agree with Judge Rea that Marte and his superior officer would have been derelict in

21

their duties had they not investigated why so many credit cards were present in the vehicle.

Because police had a lawful basis to ask for consent and the consent was given knowingly and voluntarily, the evidence seized from the vehicle was admissible and defendant's suppression motion was properly denied.

III.

We next turn to defendant's contention that Judge Rea abused his discretion by declining to re-open the suppression hearing and expand the record. Because we affirm substantially for the reasons explained by Judge Rea, we need not address defendant's argument at length. We add the following comments.

Defendant had provided to the court and to the State a CD and a transcript of what defendant claimed was "an enhanced version" of the MVR audio recording of the roadside encounter. Defendant argued that the audio recording showed that defendant and Officer Marte discussed an expired insurance card.

We agree with Judge Rea that the new evidence defendant proffered was irrelevant and would not have changed the results of suppression motion. We add that the reasonable suspicion to believe a consent search would reveal evidence of criminal activity existed before Officer Marte leaned into the car to

A-0509-20

look for the insurance identification. No card—expired or valid—was ultimately found. Furthermore, even assuming for the sake of argument that defendant had provided an expired insurance card when he presented his driving credentials, the officer would still have had a basis to look for an unexpired card.

We note that defendant's motion to expand the record was essentially a motion for reconsideration. Such motions are entrusted to the sound discretion of the court in the interest of justice. Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996). Judge Rea considered defendant's arguments and concluded that the enhanced audio recording did not contradict his ruling on the motion to suppress. We see no abuse of discretion in reaching that conclusion.

IV.

Finally, we turn to defendant's contention that the sentence he received is excessive. As a general matter, sentencing decisions are reviewed under a highly deferential standard. See State v. Roth, 95 N.J. 334, 364–65 (1984) (holding that an appellate court may not overturn a sentence unless "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience"). Our review is therefore limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether

the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."

[State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

"[A]ppellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Relatedly, a trial court's exercise of discretion that is in line with sentencing principles "should be immune from second-guessing." State v. Bieniek, 200 N.J. 601, 612 (2010).

In imposing a sentence, the court must make an individualized assessment of the defendant based on the facts of the case and the aggravating and mitigating sentencing factors. State v. Jaffe, 220 N.J. 114, 121–22 (2014). To facilitate appellate review, the sentencing court must "state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting [the] sentence . . . ." R. 3:21-4(h); accord State v. Fuentes, 217 N.J. 57, 73 (2014); see also N.J.S.A. 2C:43-2(e) (requiring the sentencing court to state the "factual basis supporting its findings of particular aggravating or mitigating factors affecting sentence.").

Judge Rea emphasized that defendant had negotiated a plea agreement that took into account the aggravating and the mitigating circumstances. Judge Rea further noted that defendant was a high-ranking member in the international money laundering scheme and was responsible for recruiting numerous coconspirators. The judge found defendant's role to be important. The illicit enterprise stole electronic funds from the victims and laundered the stolen money through the sham corporations. Defendant set up one of those sham corporations, CA Golden Trades, Incorporated, in New Jersey. The judge noted that the illicit enterprise stole millions of dollars.

The judge then proceeded to carefully analyze all applicable aggravating factors. He found aggravating factor three, (the risk that the defendant will commit another offense), "a very real aggravating factor" and gave significant weight to it.

Judge Rea also found aggravating factor five, (the substantial likelihood that the defendant is involved in organized criminal activity), applicable because defendant was involved in racketeering, which is organized criminal activity. The judge stressed that this case involved participants in New Jersey and several other states, as well as in at least three foreign countries.

The judge also found aggravating factor nine, (the need to deter defendant and others from violating the law). The judge concluded that the need for general deterrence "was a very legitimate and powerful" aggravating factor, and deemed it to be "extremely weighty" in his calculus.

The judge also found aggravating factors ten (involvement in the offense of fraudulent or deceptive practices against State government) and eleven (the imposition of a monetary penalty without a term of imprisonment would be perceived by defendant or others as just part of the cost of doing business). The judge reasoned that setting up dummy corporations in New Jersey was a deceptive practice. The judge acknowledged that although probation was not a possible sentence for defendant, factor eleven applied because defendant had committed a financial crime and a sentence other than imprisonment would be seen as a cost of doing business.

Judge Rea next considered the applicable mitigating factors. Because defendant had no prior criminal record, the judge found mitigating factor seven, (the defendant has no history of prior delinquency or criminal activity). The judge found mitigating factor twelve, (defendant's willingness to cooperate with law enforcement authorities), applicable because defendant agreed to cooperate with law enforcement. The judge also found mitigating factor six (the defendant

26

has compensated or will compensate the victim of the defendant's conduct for the damage or injury sustained), because defendant had made some effort at restitution, although the judge noted that it was a mere "drop in the bucket" compared to the millions of dollars stolen from the victims. Of the three mitigating factors deemed to be applicable, the judge noted that mitigating factor seven was the most compelling. The judge rejected defendant's argument that mitigating factor nine, (the character and attitude of the defendant indicate he is unlikely to commit another offense), applied, reasoning that defendant viewed the people he recruited as "pawns" in the illegal scheme and recruited as many people as he could so that sham corporations could be set up to funnel the stolen money.

Judge Rea concluded that the aggravating factors outweighed the mitigating factors. We are satisfied that the judge properly considered the applicable aggravating and mitigating factors and qualitatively weighed them. See State v. Dalziel, 182 N.J. 494, 505 (2005); State v. Natale, 184 N.J. 458, 488–89 (2005); Roth, 95 N.J. at 368. We decline to substitute our judgment for that of the sentencing court, State v. Miller, 237 N.J. 15, 28 (2019), and conclude that the twelve-year sentence imposed in accordance with the plea agreement does not shock the judicial conscience. Roth, 95 N.J. at 364–65.

A-0509-20

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0509-20