**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0520-23

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KERLO A. BARTHELUS, and
KHAALIQ SKINNER,

      Defendants-Appellants.

_____

          Argued February 14, 2024 – Decided March 12, 2024

          Before Judges Firko and Vanek.

          On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 23-04-0254 and 23-04-0255.

          Andrew Robert Burroughs, Designated Counsel, argued the cause for appellant Kerlo A. Barthelus (Jennifer Nicole Sellitti, Public Defender, attorney; Andrew Robert Burroughs, on the briefs).

          Ashley T. Brooks, Assistant Deputy Public Defender, argued the cause for appellant Khaaliq Skinner (Jennifer Nicole Sellitti, Public Defender, attorney; Ashley T. Brooks, of counsel and on the briefs).

Michele C. Buckley, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Michele C. Buckley, of counsel and on the brief).

PER CURIAM

Defendants Kerlo A. Barthelus and Khaaliq Skinner appeal from an August 17, 2023 order denying their motion to suppress evidence—a weapon and controlled dangerous substances (CDS)—seized during a warrantless search following a motor vehicle stop. Skinner was the driver, and Barthelus, his brother, was the back-seat passenger. After carefully reviewing the record in light of the arguments of the parties and the applicable principles of law, we conclude the stop was lawful, but defendants' motion to suppress should have been granted because the police unlawfully ordered defendants out of the car, wrongfully detained them, and searched the vehicle without a warrant. We therefore reverse the motion court's order denying defendants' motion to suppress.

I.

Defendants were charged in an indictment with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b), and third-degree possession of

2

CDS, N.J.S.A. 2C:35-10(a)(1). Skinner was also charged with a second count of third-degree possession of a CDS.

After defendants moved to suppress the evidence seized during the search, the motion judge conducted a two-day hearing during which the State presented testimony from Lieutenant Anthony Gural,[1] video footage of the encounter recorded by Gural's body worn camera (BWC), and a LawSoft[2] screenshot, which were moved into evidence.

Gural testified that at approximately 9:52 p.m. on November 10, 2022, he was traveling east on North Avenue in Elizabeth and stopped at a traffic light at Pennsylvania Avenue. Gural observed a red Honda Civic, driven by Skinner, stopped at the traffic light facing west. When both traffic lights turned green,

_____

[1] Also referred to as "Garal" in the record.

[2] LawSoft, Inc. (LawSoft) is a private entity that provides and streamlines law enforcement software. Home, LAWSOFT, INC., https://www.lawsoft-inc.com/ (last visited Mar. 5, 2024). LawSoft "integrates[] . . . [l]aw [e]nforcement software systems to allow . . . the ability to move data between these systems and eliminate redundant entry of information." Interfaces, LAWSOFT, INC., https://www.lawsoft-inc.com/fire-cad (last visited Mar. 5, 2024). LawSoft's products include, among others, Computer Aided Dispatch (CAD) and Record Management System (RMS). Computer Aided Dispatch (CAD), LAWSOFT, INC., https://www.lawsoft-inc.com/gallery (last visited Mar. 5, 2024); Record Management (RMS), LAWSOFT, INC., https://www.lawsoft-inc.com/copy-of-police-cad (last visited Mar. 5, 2024).

A-0520-23

Gural proceeded straight, and the Honda cut him off by making a left turn in front of his police car onto Pennsylvania Avenue. Gural directed Skinner to pull over, illuminated his vehicle lights and siren, and notified police headquarters. Gural approached the Honda and did not wait for backup to arrive.

Gural observed that the Honda had heavily tinted windows and Pennsylvania license plates. As he approached the vehicle, Gural noticed the windows were rolled up and extremely loud music was playing inside the vehicle. He could not see the occupants. From the rear of the driver's side passenger door, Gural instructed Skinner to lower the music and roll down all the windows. Gural also asked Barthelus, who was seated behind Skinner, to put his hands on the headrest of Skinner's seat. Skinner immediately rolled down the windows, and Barthelus put his hands on the headrest. Gural claimed he still could not ascertain how many passengers were in the vehicle.

Gural asked for Skinner's credentials, whom he recognized from "prior encounters." At the time, Gural indicated he was concerned for his safety because he was alone, the Honda's windows were heavily tinted, and the occupants continued to play music loudly during the stop, which he thought was unusual and contrary to his instructions. Gural advised the occupants that he was concerned for his safety and asked Skinner to step out of the car. Gural

4

claimed Skinner appeared nervous and asked why he was stopped. Gural told Skinner that he cut him off. Skinner apologized to him and explained that he thought Gural was slowing down or letting him go.

Skinner got out of the car and moved to the rear of the Honda as instructed by Gural. Officers Christian Estrema and L. Rodriguez[3] responded to the scene to assist. Gural proceeded to question Skinner about his vehicle, insurance, and probationary driver's license status. According to Gural, Skinner continued to appear extremely nervous and kept reaching into his pockets. When Gural asked Skinner to stop reaching into his pockets, he complied. Gural also observed that Skinner kept turning his head, looking around, and would not make eye contact with him.

Gural continued to question Skinner. In response, Skinner told Gural that the front seat passenger was his girlfriend, Mariah Thomas, and the rear seat passenger—Barthelus—was his brother. Gural asked Skinner where he was going, and Skinner responded that he was taking Barthelus home to Woodbridge. Gural noticed inconsistencies in Skinner's answers, particularly the route he was taking.

---

[3] Officer Rodriguez's first name is not contained in the record.

A-0520-23

Gural testified that when he was assigned to the Street Crimes and Narcotic Unit, he had previously encountered Skinner and Barthelus in high crime areas. The record indicates another officer identified Barthelus and told Gural "where he spends his time." Gural searched Skinner's name on LawSoft and found a discrepancy in his address, which caused Gural concern. Skinner's driver's license indicated an address in Willingboro, and other documents listed an address in Elizabeth.

While Gural was speaking with Skinner at the rear of the vehicle, Rodriguez illuminated the inside of the vehicle. Barthelus offered to roll the window down. The record is unclear, but somehow the rear passenger door was unexpectedly opened. Concerned by what he thought was unusual behavior, together with Skinner's nervousness, Rodriguez requested Barthelus exit the vehicle, which he did.

Gural questioned both defendants about where they lived, where they were coming from, and where they were going. Both defendants claimed they had been hanging out and smoking marijuana at Kellogg Park located a few blocks away. Gural questioned Skinner as to why he did not drive east on North Avenue toward the highway after leaving the park instead of driving west on North Avenue before turning left onto Pennsylvania Avenue. Skinner answered that

6

he made the wrong turn after leaving the park and tried to turn around. However, Barthelus said he lived in downtown Elizabeth. Gural was troubled because the two were not headed in the direction Skinner stated. Gural then instructed the other officers to check Barthelus's "identification," and he produced his driver's license.

When questioned about his girlfriend, Skinner indicated they lived together in Willingboro. Thomas was removed from the vehicle by Rodriguez, and after he asked where she lived, she answered, "Newark." After the three occupants had been removed from the vehicle and were ordered to stand at the rear of the car, no pat down search was conducted of any of them. Gural admitted he extended the scope of the stop since he recognized both defendants, they lived and hung out in "high-crime areas", and because he wanted "to investigate the inconsistencies" in their statements.

Gural testified he thought defendants' answers were "deceptive" and gave him a "funny feeling," but agreed their answers had nothing to do with anything illegal. And, Gural conceded that the investigation was unrelated to illegal drugs, firearms, or defendants being suspects for other crimes. The car had not been reported as being involved in some other offense. Gural ultimately verified Skinner's driver's license address was correct after checking the Motor Vehicle

A-0520-23

Commission database. Gural asked defendants whether the officers were going to find anything illegal inside the car, and Barthelus responded "no."

After two or three of the vehicle's doors were open and all three occupants were situated at the rear of the Honda, Gural instructed the other officers to conduct a protective sweep of the vehicle because he was concerned for the officers' safety. Prior to the search, Gural testified the three officers were within a foot or two of the three occupants and "had visuals" on them. The officers found a Beretta nine-millimeter handgun on the front passenger floorboard. The three occupants were then handcuffed and told to sit down while the officers further searched the vehicle. They discovered vacuum-sealed packages of unregulated marijuana inside the driver's side door pocket and a bottle containing Oxycontin pills. The officers also recovered fourteen bags of cocaine from Skinner's front pants pocket. Skinner was not issued any traffic violation summonses.

Following the close of the hearing, the motion judge gave an oral decision. The motion judge noted Skinner was cooperative with the police, and the scene was not "chaotic." In the motion judge's view, the litany of questions Gural asked defendants was appropriate, as to where they were coming from and headed. The motion judge found defendants' stories did not "match up," and

that Skinner was "evasive with the police" when asked about whether there was contraband in the car and allowed Barthelus to answer for him.

The motion judge denied defendants' motion to suppress finding: the stop of the car was justified based on reasonable articulable suspicion of a motor vehicle violation because Skinner "cut in front" of Gural's vehicle; the stop was not pretextual based on the race of the occupants in the vehicle; the vehicle had tinted windows and Gural did not know who he had pulled over; the stop was not unlawfully prolonged; Gural had a specific and articulable basis to investigate the occupants; and defendants providing conflicting statements to the police, and acting "oddly[,]" furnishing the officers with probable cause to search the vehicle to ensure their safety. The motion judge found the stop lasted about fifteen minutes.

The motion judge reasoned that Gural's "antenna" went off based on his "experience" in conducting multiple motor vehicle stops. The motion judge determined "the officers were allowed to search the interior of the vehicle for the weapons or for contraband to . . . ensure their own safety in the stop." The motion judge found the actions taken by the police officers were "justified" and "within the parameters of the law." A memorializing order was entered. This appeal followed.

A-0520-23

Barthelus presents the following arguments for our consideration:

POINT I

AS THE MOTOR VEHICLE STOP IN THIS CASE WAS UNLAWFUL, ALL EVIDENCE SEIZED DURING THE SUBSEQUENT WARRANTLESS SEARCH OF CO-DEFENDANT'S SKINNER'S VEHICLE MUST BE SUPPRESSED.

POINT II

AS THERE WAS AN INSUFFICIENT REASONABLE AND ARTICULABLE SUSPICION THAT DEFENDANT [BARTHELUS] HAD BEEN OR WAS ENGAGED IN ANY CRIMINAL CONDUCT TO JUSTIFY THE INVESTIGATORY STOP, THE CONTINUED SEIZURE OF DEFENDANT WAS UNCONSTITUTIONAL.

POINT III

AS THERE WAS NOT A REASONABLE AND ARTICULABLE SUSPICION THAT DEFENDANT [BARTHELUS] PRESENTED A DANGER OR WAS IN ANY MANNER ENGAGED IN ILLEGAL CONDUCT, HIS REMOVAL FROM SKINNER'S VEHICLE AND THE DEMAND THAT HE PRODUCE HIS DRIVER'S LICENSE WAS UNCONSTITUTIONAL.

(A) The Removal And Seizure Of Defendant [Barthelus] By Police Was Unreasonable And Unconstitutional.

(B) The Demand By [Gural] That Defendant [Barthelus] Produce His Driver's License Was An Unjustified And Unreasonable Privacy Intrusion.

10

POINT IV

AS THERE WAS INSUFFICIENT PROBABLE
CAUSE THAT THERE WAS CONTRABAND IN
SKINNER'S VEHICLE AND THAT DEFENDANTS
HAD BEEN OR WERE ENGAGED IN ILLEGAL
ACTIVITIES, THE AUTOMOBILE EXCEPTION TO
THE SEARCH WARRANT REQUIREMENT DOES
NOT APPLY.

POINT V

AS THERE WAS NO LEGAL BASIS FOR A
PROTECTIVE SWEEP TO JUSTIFY THE ENTRY
INTO AND SEARCH OF CO-DEFENDANT'S
SKINNER'S VEHICLE, ALL EVIDENCE SEIZED
THEREOF MUST BE SUPPRESSED.

Skinner presents the following arguments for our consideration:

POINT I

THE POLICE UNLAWFULLY STOPPED THE CAR,
DEMANDED . . . BARTHELUS'[S] IDENTIFICA-
TION, PULLED THE PASSENGERS OUT OF THE
CAR, PROLONGED THE STOP AND SEARCHED
THE CAR WITHOUT A WARRANT. THE
EVIDENCE MUST BE SUPPRESSED.

A. The State Failed To Establish That Gural Had
Reasonable Articulable Suspicion For The Motor
Vehicle Stop.

B. The Police Did Not Have A Basis To Demand
. . . Barthelus'[s] License Or To Order . . .
Barthelus Out Of The Car.

11

C. The Officers Did Not Have Reasonable And Articulable Suspicion To Continue To Detain . . . Skinner And . . . Barthelus After Confirming The Validity Of . . . Skinner's Insurance, License And Registration.

D. The Police Did Not Have A Reasonable And Articulable Basis For A Protective Sweep.

E. The Police Lacked Probable Cause To Believe Contraband Or Evidence Of Criminal Activity Was Inside The Car.

II.

Our scope of review of a trial court's suppression ruling is well established. We must "defer[] to the trial court's factual findings" and uphold them so long as they are supported by "sufficient credible evidence in the record." State v. Nelson, 237 N.J. 540, 551 (2019). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" State v. Robinson, 200 N.J. 1, 15 (2009) (alteration in original) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). In contrast, we review the trial court's interpretation of the law and the legal "consequences that flow from established facts" de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

Turning to the substantive legal principles governing this appeal, "[t]he Fourth Amendment of the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee the right to be free from unreasonable searches and seizures." Nelson, 237 N.J. at 552 (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). "Our jurisprudence under both constitutional provisions expresses a preference that police officers secure a warrant before they execute a search." State v. Witt, 223 N.J. 409, 422 (2015). "Warrantless searches are permissible only if 'justified by one of the "few specifically established and well-delineated exceptions" to the warrant requirement.'" Ibid. (quoting State v. Frankel, 179 N.J. 586, 598 (2004) (quoting Mincey v. Arizona, 437 U.S. 385 (1978))). "[T]he State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure" falls within an exception. Elders, 192 N.J. at 246.

Before we consider whether an exception existed to search the vehicle, we must conclude there was a lawful traffic stop. "A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532 (2017). "To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'"

13

State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40, modified on other grounds, 174 N.J. 351 (2002)); see also State v. Bernokeits, 423 N.J. Super. 365, 370 (App. Div. 2011) ("A motor vehic[le] violation, no matter how minor, justifies a stop without any reasonable suspicion that the motorist has committed a crime or other unlawful act.").

The reasonable suspicion standard requires "'some minimal level of objective justification for making the stop.'" State v. Nishina, 175 N.J. 502, 511 (2003) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." State v. Scriven, 226 N.J. 20, 34 (2016). "Although reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" State v. Nyema, 249 N.J. 509, 527 (2022) (alterations in original) (quoting State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part)).

"Determining whether reasonable and articulable suspicion exists . . . is a highly fact-intensive inquiry that demands evaluation of 'the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be

14

protected from unwarranted and/or overbearing police intrusions.'" Id. at 528 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)). "It is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers." Stovall, 170 N.J. at 363.

In assessing the totality of the circumstances for a stop based on a motor vehicle violation, a reviewing court must determine "[whether] the facts available to the officer at the moment of the seizure . . . warrant [an individual] of reasonable caution in the belief that the action taken was appropriate." State v. Arthur, 149 N.J. 1, 7-8 (1997) (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)). Stated differently, the stop must be lawful at the moment the Fourth Amendment seizure is initiated.

However, "the State is not required to prove that the suspected motor-vehicle violation occurred." State v. Locurto, 157 N.J. 463, 470 (1999). Rather, "[c]onstitutional precedent requires only reasonableness on the part of the police, not legal perfection. Therefore, the State need prove only that the police lawfully stopped the car, not that it could convict the driver of the motor-vehicle offense." State v. Williamson, 138 N.J. 302, 304 (1994); see also State v. Sutherland, 231 N.J. 429, 439 (2018).

A-0520-23

The search incident to arrest exception "was limned for two specific purposes—the protection of the police and the preservation of evidence." State v. Eckel, 185 N.J. 523, 524 (2006). However, when law enforcement has probable cause to arrest, it is not unlawful to search the individual prior to placing them under arrest. State v. O'Neal, 190 N.J. 601, 614-15 (2007). In evaluating whether there is probable cause to arrest, courts consider the "totality of the circumstances . . . from the standpoint of an objectively reasonable police officer." State v. Basil, 202 N.J. 570, 585 (2010) (internal citations omitted).

Probable cause is a "'common-sense, practical standard' dealing with 'probabilities' and the 'practical considerations of everyday life,[']" and is generally understood to mean "'less than legal evidence necessary to convict though more than mere naked suspicion.'" State v. Evers, 175 N.J. 355, 381 (2003) (first quoting State v. Sullivan, 169 N.J. 204, 211 (2001); and then quoting State v. Mark, 46 N.J. 262, 271 (1966)).

A.

We first address defendants' contention that Gural did not have a reasonable articulable suspicion to justify the motor vehicle stop. Defendants argue that the video evidence does not support Gural's assertion Skinner made an illegal left turn or violated any motor vehicle laws. According to defendants,

16

the BWC footage is inconsistent with Gural's testimony because the video shows Gural driving towards the intersection of North and Pennsylvania Avenues, and the traffic light had turned green before he reached the intersection.

Defendants allege the video does not show any oncoming car lights in the intersection as Gural approached it, and no other vehicle can be observed in the intersection, leading to the inference that Skinner's vehicle must have already turned left onto Pennsylvania Avenue from North Avenue before Gural entered the intersection. Defendants assert Gural did not memorialize in his report that he had to "stop short" as he testified to on cross-examination and that Skinner almost struck his vehicle. Defendants point out Gural testified that making a left turn at an intersection is not necessarily illegal. We reject defendants' argument.

Based upon Gural's "credible" testimony, which was corroborated by his BWC, he was stopped at a red light waiting for the light to change when Skinner's vehicle, which was traveling in the opposite direction, made a quick left turn in front of his vehicle and failed to yield.

N.J.S.A. 39:4-90 provides:

> The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection. When [two] vehicles enter an intersection at the same time the driver of the vehicle

on the left shall yield the right of way to the driver of the vehicle on the right.

The driver of a vehicle within an intersection intending to turn to the left shall yield to a vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but the driver having so yielded, and having given a signal when and as required by law, may make the left turn; and other vehicles approaching the intersection from the opposite direction shall yield to the driver making the left turn.

Contrary to defendants' assertions, the BWC footage showed Gural was stopped at the red light for approximately ten seconds before the light turned green, oncoming lights were shining into his car, and Skinner's vehicle made a quick left-hand turn in front of him, thus failing to yield to Gural's vehicle. Gural then made a right-hand turn towards Skinner's vehicle. In addressing the issue, the motion judge found there was a reasonable basis for Gural to initiate a motor vehicle stop for a violation of N.J.S.A. 39:4-90 because Skinner "cut off" his police car while making a left-hand turn instead of yielding to oncoming traffic. The record supports the motion judge's finding.

Moreover, Skinner was recorded on the BWC footage saying "he's sorry" to Gural for cutting his police car off while making the left turn. In deferring to those credibility findings, we are satisfied there was sufficient evidence to

support the motion judge's determination that Gural had a reasonable articulable suspicion for the motor vehicle stop.

B.

We turn to defendants' argument that, even if the traffic stop was justified, Gural unlawfully prolonged the stop into an investigative detention, and therefore, the warrantless search was unconstitutional and did not fall within the automobile exception. Barthelus claims the police officers requested his identification—driver's license—and removed him from the vehicle without reason to suspect him of criminal activity or a belief that he posed a safety risk to them. Defendants argue Gural prolonged the detention and expended its scope "based on impermissible race-based stereotypes"[4] and without any objective basis for reasonable suspicion. Defendants also assert the police searched the vehicle without having reasonable suspicion that a weapon might be inside the vehicle, or that any of the individuals had access to the vehicle, and without probable cause, warranting suppression of the weapons and CDS.

During a lawful traffic stop, a police officer is permitted to "inquire 'into matters unrelated to the justification for the traffic stop,'" Dunbar, 229 N.J. at 533 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)), and "may make

---

[4] Defendants are African-American males.

'ordinary inquiries incident to [the traffic] stop,'" Dunbar, 229 N.J. at 533. "If, during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances 'give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" State v. Dickey, 152 N.J. 468, 479-80 (1998) (quoting United States v. Johnson, 58 F.3d 356, 357-58 (8th Cir. 1995)).

The inquiries, however, "may not [be performed] 'in any way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.'" Dunbar, 229 N.J. at 535. A detention following a lawful stop "must be reasonable both at its inception and throughout its entire execution." Coles, 218 N.J. at 344. Prolonging a traffic stop "beyond the time reasonably required to complete the . . . stop's purpose . . . is unlawful absent independent reasonable suspicion of criminal activity." Dunbar, 229 N.J. at 536.

In determining "whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." Dickey, 152 N.J. at 477 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)). "An officer does not need a warrant to make [an investigatory] stop if it is based on 'specific and articulable facts which, taken together with rational

inferences from those facts,' give rise to a reasonable suspicion of activity." State v. Rodriguez, 172 N.J. 117, 126-27 (2002) (quoting Terry, 392 U.S. at 21).

Our Supreme Court has declared the "standard for reasonable suspicion required to uphold an investigative detention is lower than the standard of probable cause to justify an arrest[,]" Nishina, 175 N.J. at 511, and "must be based on the law enforcement officer's assessment of the totality of the circumstances he [or she] faced," Id., (quoting State v. Davis, 104 N.J. 490, 504 (1986)). A detention, however, becomes unlawful when it is longer than is reasonably necessary to diligently investigate an officer's reasonable suspicion of criminal activity. Dickey, 152 N.J. at 476-79.

"Nervousness and excited movements are common responses to unanticipated encounters with police officers on the road." State v. Rosario, 229 N.J. 263, 277 (2017). Such "cannot support a detention in the first place[,]" let alone extending the detention. Ibid; see also Nyema, 249 N.J. at 533 (finding that "nervous behavior or lack of eye contact with police cannot drive the reasonable suspicion analysis given the wide range of behavior exhibited by many different people for varying reasons while in the presence of police"); State v. Lund, 119 N.J. 35, 47 (1990) (noting that "[o]rdinarily, mere furtive gestures of an occupant of an automobile do not give rise to an articulable

21

suspicion suggesting criminal activity").  In <u>State v. Carty</u>, in addition to nervousness, our Court reasoned an officer's concern about conflicting stories does not support reasonable suspicion if that concern could possibly be incorrect.  170 N.J. 632, 648 (2002).

Here, Gural testified he detained defendants based on their conflicting stores.  However, Gural confirmed that Skinner's address on his driver's license was correct.  Moreover, the record is devoid of any evidence that defendants or Thomas made any furtive movements to create the "chaotic" scene that Gural described in his testimony.  To the contrary, the BWC footage shows defendants were not "nervous" as Gural testified to that would have led to a heightened sense of caution.  And, the testimony and evidence bore out that both defendants were compliant with every instruction and order that Gural and the other officers gave.  The motion judge found the scene was not chaotic and that defendants were cooperative with the police.

Although Gural and another officer recognized defendants from prior encounters, that information alone was insufficient to find a reasonable and articulable suspicion justifying the stop beyond issuing a motor vehicle summons, which was not done here.  <u>See Arizona v. Johnson</u>, 555 U.S. at 333 (finding police inquiries to passengers unrelated to the justification of stop

convert it to an unlawful detention it if measurably extends the stop). We thus conclude the State failed to meet its burden at the suppression hearing, and that the weapon and CDS found in the Honda and on Skinner's person must be suppressed as fruit of the unlawful motor vehicle search. Wong Sun v. United States, 371 U.S. 471, 484-88 (1963) (rejecting the proposition that a search unlawful at its inception may be validated by what it turns up.")

C.

We next address Barthelus's argument that there was no reasonable and articulable suspicion that he presented a danger or was in any manner engaged in illegal conduct, thereby making his removal from the vehicle and demanding he produce his driver's license unconstitutional. Barthelus contends the police acted illegally in requesting his driver's license and ordering him out of the car because there was no reason for the officers to suspect him of any wrongdoing or to believe they were in danger. Barthelus further avers that from the moment they were pulled over, he and Skinner were "perfectly compliant," Skinner rolled down his driver's side window, gave Gural his credentials without being asked, and turned down the music as soon as he finished putting his documentation together as instructed.

Even though Gural testified Skinner wrongfully turned left in front of him as he approached the intersection and delayed in turning down the music, Barthelus contends these reasons did not constitute an objective basis for reasonable suspicion. Barthelus also claims the rear windows of Skinner's vehicle were tinted but that did not provide a basis for concern because tinted rear windows are not illegal.

"For ordering occupants out of a vehicle during a routine stop or a traffic violation, in order to adequately protect police officers, our Court announced a standard of 'heightened caution' . . . ."

> [T]he officer need not point to specific facts that the occupants are "armed and dangerous." Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car.
>
> [State v. Smith, 134 N.J. 599, 618 (1994).]

Our Court elaborated that "the officer must be able to articulate specific reasons why the person's gestures or other circumstances caused the officer to expect more danger from this traffic stop than from other routine traffic stops." Id. at 619; see Id. at 619-20 (concluding that the circumstances were sufficient to warrant the order that the passengers leave the vehicle because: (1) the occupants

24

made suspicious movements; (2) it was 2:29 a.m.; and (3) the Turnpike, where the stop occurred, was deserted).

Here, the record shows that Barthelus remained compliant and did not make any furtive movements during the police encounter. The BWC footage is not clear as to how the rear passenger-side door became open during the stop. The State speculates it was Barthelus as a passenger who opened the door from the rear seat on the driver's side, but Thomas could have also opened the door from the front seat passenger side. In any event, the BWC footage indicates that minutes elapsed between the opening of the door and the police ordering Barthelus out of the vehicle, and there is no evidence in the record that either he or Thomas made any movements to create heightened suspicion. Gural was unable to testify as to any specific and articulable facts that suggested defendants or Thomas were dangerous. Therefore, we conclude that the heightened caution standard was not satisfied here.

Moreover, officers violate the Fourth Amendment when they demand identification from passengers in a vehicle regarding whom they have no suspicion. Hornberger v. Am. Broad. Co., 351 N.J. Super. 577, 612 (App. Div. 2002). "This view is most consistent with our Supreme Court's decision in Carty and the prophylactic purpose of discouraging the police from turning a routine

traffic stop into a "fishing expedition for criminal activity unrelated to the stop." Id. at 614. Like in Hornberger v. American Broadcasting Co., where the passengers had done nothing more suspicious than riding in a car with tinted windows and a request for passengers' identification with a reasonable suspicion of criminal conduct was improper, Barthelus did not do anything suspicious and remained compliant. Id. at 611-12, 614. Therefore, the request for Barthelus's driver's license was also improper.

D.

Finally, we address defendants' argument that the police did not have a reasonable and articulable basis to conduct a protective sweep, and the protective sweep exception does not apply to uphold the search. We agree.

The protective sweep doctrine is a recognized exception to the warrant requirement. The exception derives from the United States Supreme Court's holding in Terry v. Ohio, 392 U.S. 1 (1968) (authorizing the limited intrusion of a police "stop and frisk" of a pedestrian where there is reasonable suspicion that the individual may have engaged in criminal activity).

In Long, the United States Supreme Court applied the protective sweep exception in an automobile setting. Michigan v. Long, 463 U.S. 1032, 1049 (1983). There, the Court authorized a limited search of a vehicle's passenger

26

area for purposes of officer safety.  Ibid.  The Court observed in Long that such a "protective sweep" should be restricted to those areas where a weapon could be hidden or placed if an officer "possesses a reasonable belief based on specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant" the officer's belief that the suspect poses a danger and "may gain immediate control of weapons."  Ibid. (quoting Terry, 392 U.S. at 21.) (internal quotation marks omitted).

In Lund, our Court adopted the federal test for vehicular protective sweeps that had been articulated in Long.  119 N.J. at 48-50.  Hence, the coterminous federal and state constitutional standard for a valid protective sweep is whether the State demonstrates "specific and articulable facts that, considered with the rational inferences from those facts, warrant a belief that an individual in the vehicle is dangerous and that he or she 'may gain immediate control of weapons.'"  State v. Robinson, 228 N.J. 529, 547 (2017) (quoting Long, 463 U.S. at 1049.)  See also State v. Gamble, 218 N.J. 412, 432 (2014). The police may perform a warrantless protective sweep of a vehicle's passenger compartment where the totality of circumstances support "a reasonable suspicion that a driver or passenger 'is dangerous and may gain immediate access to weapons.'"  Robinson, 228 N.J. at 534 (quoting Gamble, 218 N.J. at 432).

Our Court concluded on the factual record in Gamble that a warrantless protective sweep of a car interior was justified. 218 N.J. at 433. In that case, the police conducted an investigatory stop of a vehicle matching the reported description of a van in which a man had been seen sitting with a gun in his lap. Id. at 418-19. As the two police officers on the scene approached the van, the defendant driver and his passenger were "moving frantically inside the vehicle, as if trying to hide something." Id. at 419 (internal quotation marks omitted).

When the lead officer ordered the occupants out of the vehicle, the defendant aborted his exit from the vehicle and tried to return to the driver's seat. Id. at 420. The lead officer pulled the defendant from the van, frisked him for weapons, and placed him under the supervision of the other officer who was also guarding the passenger. Ibid. Our Court held in Gamble that, in light of defendant's defiant conduct and the officers' failure to find a weapon on the person of either occupant, a protective sweep of the vehicle was justified at that point. Id. at 433. Our Court reasoned that the officers had a reasonable basis to believe that the individuals were dangerous and could gain immediate access to weapons. Id. at 434.

In its later May 2017 opinion in Robinson, our Court reached an opposite conclusion, striking down as illegal the warrantless search of a passenger

28

compartment after a valid motor vehicle stop. There, a single officer in a marked patrol car conducted a valid motor vehicle stop, saw four people in the car, and noticed that none of the occupants were wearing a seatbelt. 228 N.J. at 536. Shortly after making the stop, the officer was advised by his department's dispatcher that the driver of the car had an outstanding warrant for a drug offense. Id. at 537. The dispatcher also told the officer to use caution because the defendant was known to carry weapons. Ibid. The dispatcher further advised the officer that one of the passengers also had an outstanding traffic warrant. Ibid. The officer called for backup and was met by four other uniformed officers, who assisted in directing two of the four occupants out of the car, as well as handcuffing, and arresting them. Id. at 537-38. The officers detained, but failed to arrest, the other two occupants. Id. at 538.

The officers then patted down the two detained individuals, but found no weapons. Ibid. The two men, who remained uncuffed, were then told to stand on the roadside as the officers monitored them. Ibid. The testifying officer stated that he did not see either of the detained passengers reach for a weapon, attempt to hide anything, or resist the officers' directions. Ibid. The sergeant on the scene then directed one of the officers to conduct a sweep of the car's interior to check for weapons. Ibid. After searching the front driver and

passenger areas, the officer lifted a purse found on the front passenger seat.  Ibid.
The officer testified that he felt the outline of a gun when he felt the bottom of
the purse.  Id. at 538-39.  The gun was retrieved by the officer, all passengers
were secured, and the five officers on the scene then decided to obtain a search
warrant.  Id. at 539.

Our Court found the on-the-spot search of the car that produced the
handgun was not within the warrant requirement's protective sweep exception.
Robinson, 228 N.J. at 549.  Our Court concluded that, although the
circumstances justified a reasonable suspicion a weapon was in the vehicle, the
five officers' "swift and coordinated action eliminated the risk that any of the
four occupants would gain immediate access to the weapon."  Id. at 535.

Our Court recognized in Robinson that there was "no doubt" that the
officers had justifiable support for a reasonable suspicion that at least some of
the occupants were armed and that a weapon was present, especially given the
late hour of the stop, among other considerations.  Id. at 548.  In addition, our
Court recognized that although no weapons were found on the occupants when
they were frisked, the absence of weapons did not remove the need for concern.
Ibid.; see Gamble, 218 N.J. at 432-33. Even so, our Court emphasized that this

potential danger had been met at the scene with effective and prompt police action. Robinson, 228 N.J. at 549.

The Robinson Court further noted that because the original responding officer had "summoned four backup officers, the officers outnumbered the occupants of the vehicle." Ibid. Two of the occupants were handcuffed, while those that remained unsecured "were cooperative" and "carefully monitored." Ibid. Our Court concluded that the officers collectively were therefore able to maintain control of the vehicle and the scene generally. Ibid. Because of this prudent police work, none of the vehicle's former occupants realistically had the opportunity to access the vehicle or a weapon. Ibid.

Governed by the principles, we are convinced there were no grounds to support a protective sweep here. Defendants and Thomas had been removed from the Honda and complied with Gural's and the other officers' commands. The record is devoid of any evidence that Gural or the other officers suspected defendants committed a crime or what they expected to find in the vehicle. Moreover, Gural did not feel sufficiently threatened to pat down defendants or Thomas, who had already been removed and secured, before ordering the protective sweep.

31

When the protective sweep was conducted, the Honda's doors were open, the occupants had been removed, and the interior of the vehicle was readily visible to Gural and the officers. And, Estrema and Rodriguez had already inspected the interior of the Honda using their flashlights before Gural ordered the protective sweep. Approximately fifteen minutes had elapsed before the protective sweep occurred. We conclude there was ample time in light of the facts and circumstances presented here for Gural and the officers to secure defendants and Thomas. Ibid. at 533. The protective sweep was not justified based on our review of the record.

For all of the reasons stated, we reverse the August 17, 2023 order denying defendants' motion to suppress. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION